[No. S010164. Apr. 10, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
RODNEY GENE BEELER, Defendant and Appellant.

954

958

## COUNSEL

Pierce O'Donnell, under appointment by the Supreme Court, Kenneth A. Freeling, Clara A. Pope, John Schaeffer, Steve Rottman, Wilmer Harris and Kaye, Scholer, Fierman, Hays & Handler for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley and Patti W. Ranger, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

THE COURT.—Defendant Rodney Gene Beeler was convicted of one count of first degree murder (Pen. Code, § 187) and one count of burglary (Pen. Code, § 459) committed with the personal use of a firearm (Pen. Code, § 12022.5). The jury found to be true the special circumstance that the murder was committed during a burglary. (Pen. Code, § 190.2, subd. (a)(17)(vii).) The jury returned a verdict of death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).) We affirm the judgment in its entirety.

### GUILT PHASE FACTS

1. *The Prosecution*

The prosecution's theory of the case was that defendant entered the unoccupied residence of Anthony Joseph Stevenson (Tony) to commit a burglary, that Tony returned home and discovered defendant, and that, as Tony fled the house, defendant shot him. The key prosecution evidence was as follows:

Shortly before 11 a.m. on December 30, 1985, Tony was found lying on a lawn near the house where he resided with his brothers Dino Stevenson

(Dino) and Michael Stevenson (Michael) in the City of Orange. Tony had been shot in the back. Police and paramedics were called to the scene. Tony died on the lawn.

The house's rear sliding-glass door had been pried open with a screwdriver. The house, including the brothers' bedrooms, had been ransacked. Bullets for Tony's .22-caliber semiautomatic Marlin rifle were strewn across his bed. The rifle was shattered on the hallway floor. Michael's bedroom door had a large gash that was attributed to the butt of Tony's rifle.

Missing from the house were jewelry (including a gold chain and an Italian gold charm), a 35-millimeter camera, $1,200 in cash, a dark blue gym bag, and Dino's fake Rolex watch. Also taken was Michael's .22-caliber single-action Ruger revolver, which he had kept unloaded under his bed with two bullets nearby.

A fingerprint identified as being defendant's was found on the top of a metal file cabinet in the southwest bedroom.

An autopsy showed that Tony died from a single gunshot wound—a .22-caliber long-rifle bullet that entered the left side of his back at an upward 45-degree angle, struck his left lung, and pierced his heart. There was no exit wound. The muzzle was more than two feet away from Tony when the shot was fired. The bullet was not fired from Tony's .22-caliber rifle but could have been fired from a .22-caliber single-action Ruger revolver similar to the one taken from Michael's bedroom. (That gun was never recovered.)

Police found a bullet hole in a car parked on the street in front of the Stevenson house. The car's owner testified she had parked the car at that location about 9:30 the morning of the killing. Ballistics tests showed the bullet was consistent with a .22-caliber long-rifle projectile, but police could make no further conclusions as to the nature or source of the bullet because of extensive damage to it caused by passing through the car door. In particular, they could not determine whether it had been fired from either Michael's revolver or Tony's rifle.

The front, main door of the Stevenson house was open, but the screen door was closed. The screen door had what appeared to be a small bullet hole, although no gun powder residue was found on the screen. Police ran a string from the hole in the screen door to the bullet hole in the car door and concluded that the bullet found in the car could have been fired from inside the house through the screen door into the car.

The homicide investigator conducting the string experiment found on the "very well taken care of and landscaped and trimmed" front lawn of the

Stevenson residence an indentation, "a rounded portion where it appeared something had fallen down, *possibly a knee*, right into the lawn underneath the string. And then right next to the indentation, the rounded portion, there was a disturbance where the grass had actually been pulled up." (Italics added.) The implication was that Tony had been shot from inside the house as he was running across the yard trying to escape from a burglar.

Tony and his brothers resided at 1144 Everett Street. Floyd Raney resided at 1104 Everett Street. About the time of the killing, Raney was in his garage, with the door open, when he heard a motor running. He went into his driveway and saw a pickup truck parked directly across the street. Defendant approached Raney's garage. He wore pale blue jeans and what appeared to be a solid blue shirt. Defendant asked Raney, "My cat jumped the wall in your backyard. Would you look back there, please, and see if my cat is back there?" Raney stepped into his backyard to look for the cat, but when he returned to the garage, defendant "was takin' off across the street in the truck." At trial, Raney identified a photograph of defendant's truck as being similar to the truck Raney saw that day.

Everett Street runs east to west. The parallel street immediately to the south is East Rose Avenue. A block wall, about six feet high, runs between the backyards of the houses on the south side of Everett and those on the north side of East Rose. Lavada Hoskins resided at 1115 East Rose. The common wall ran along the rear edge of her backyard. The morning of the killing, Mrs. Hoskins was in her backyard, talking to her next-door neighbor, Mrs. Fern Awalt. Both women saw a man walking along the top of the block wall. Mrs. Awalt recalled the time as being between about 10:30 a.m. and 11:30 a.m. Neither woman saw the man's face, but Mrs. Hoskins recalled him wearing a blue plaid shirt and carrying a small, dark sports bag. Mrs. Awalt did not see a bag, but she recalled the man was wearing work pants and a shirt that were solid blue. Mrs. Awalt required eyeglasses to read and was not wearing her glasses when she saw the man on the wall.

Neither Hoskins, Awalt, nor Raney saw any other unknown persons in the area at the approximate time of the killing.

Defendant worked at a laminated products company (the company) as a senior line operator. Jim Anderson also worked at the company and reported to defendant. Anderson recalled that defendant left work early the day of the killing, about 10 a.m., and did not return until the afternoon.

Calvin Brunsting, the company's manager in charge of time cards, testified that defendant's card for December 30, 1985, indicated that he clocked

into work that day at approximately 5:45 a.m. Sometime after December 30, 1985, defendant asked Brunsting to write on defendant's card the time he left on December 30 and the time he came to work the following day. Defendant said he had forgotten to punch the clock for those times. Brunsting complied with defendant's request and indicated on defendant's card for December 30 that he left work at 3:40 p.m.

John Lorenzi worked with defendant. Lorenzi testified that, one day between Christmas and New Year's Eve 1985, defendant said to him at work, "John, let me ask you a hypothetical question. If I was—if you were robbing somebody's house, someone who lived there caught you in the act, would you shoot him?" Lorenzi replied, "Why? Did you kill somebody?" Defendant became upset and responded, "No, asshole."

Defendant later had a similar exchange with co-worker Jim Anderson, asking him, "Hypothetically speaking, if you were robbing a house and the guy came home—the guy that lived there, this is, came home and you had a gun, would you shoot him?" Anderson replied, "No, I wouldn't. I wouldn't put myself in that position to begin with. Why, did you do something, did you kill somebody?" Defendant denied having done so and walked away.

Sometime after January 1, 1986, defendant attempted to sell Dino's watch to Anderson for $500. On January 7, 1986, defendant sold to an acquaintance the Italian gold charm taken from the Stevensons' house. Defendant's employer provided lockers for its workers. Police found in defendant's locker the camera and lens taken from the house.

### 2. The Defense

The primary defense theory was that defendant's employment supervisor, Mitchell Jackley, participated in the burglary and was the actual killer. Jackley was granted immunity in exchange for testifying for the prosecution at defendant's preliminary hearing. At trial, the defense called him to testify. Jackley denied killing Tony Stevenson. Defendant attacked Jackley on two basic fronts: (1) Jackley's intimate knowledge of the crime details suggested he may have been the killer; (2) Jackley had been charged with a similar crime several years earlier, but after he testified for the prosecution in that case, charges were dismissed.

### A. Jackley's knowledge

Jackley testified he had breakfast with defendant the day of the killing and afterward authorized defendant to leave work. Later in the day, defendant

allegedly told Jackley that defendant had entered the Stevenson house and killed Tony Stevenson. Sometime thereafter, Jackley stole the key to defendant's work locker, observed a camera, and handled it with silk gloves so that he would not leave fingerprints on it.

On January 9, 1986, Jackley anonymously called police and implicated defendant in the Stevenson killing. Jackley claimed he called anonymously because he was concerned he might be implicated in the crime for two reasons. First, Jackley had been in the victim's house on at least one social occasion before the killing and was afraid his fingerprints might be found there. (Jackley's wife was acquainted with Dino Stevenson.) Second, Jackley testified he had been charged with a prior murder. Jackley also admitted to having received stolen goods from defendant, i.e., a ring that defendant had allegedly stolen during a rape and robbery.

Jackley told police that defendant gave the following account of the crime to Jackley: "The way he explained it to me is that while he was in the house, that is, ah, ah, Tony apparently's his name, came in and brought his— brought his dog in? Ya. Called his dog. His dog was with him. Rodney was saying his dog was with him and he thought he was calling some friends or somethin' and then—what the fuck else did he say?—he said right after that took place, Rodney apparently was in one of the bedrooms, he said or somethin', and went behind the corner or somethin' like that . . . . And the guy [Tony] went into his room. He [defendant] told me he [Tony] came out with a goddamn ah rifle and told him he was gonna beat the shit out of him with it, and he's gonna to do [sic] bodily damage. . . . And he [defendant] said somethin' to the effect that they got into an altercation in the hallway, and that the guy came at him with a rifle, used it like a club—."

Jackley testified to other details of the crime, allegedly told to him by defendant: defendant had "hit" two rooms in the Stevenson house and was in a third when he was interrupted by Tony. Defendant took a .22-caliber revolver from the house and shot Tony in the back with a hollow-point bullet as Tony was running away from the house. Tony fell on the front lawn. Defendant escaped the area "down a brick wall running on the back of" the Stevenson house. He had left his truck idling. He had a conversation with a person outside the house at the end of the wall. (This last reference was apparently to the conversation between Floyd Raney and defendant.)

### B. *Jackley's prior crimes*

Jackley, his wife, and two of his acquaintances were arrested in 1974 in connection with a robbery-murder in South Carolina. Jackley admitted he

had previously committed a burglary with one of these acquaintances but denied involvement in the killing. As in the present case, one of the South Carolina defendants allegedly confessed the killing to Jackley, an anonymous call was made to police implicating that defendant, Jackley knew many details of the crime, and he had received stolen goods from those defendants. The South Carolina charges against Jackley, however, were dropped after he testified for the prosecution against his acquaintances.

Jackley admitted to three other burglaries in which (1) he knew the victims, (2) the items taken were similar to those taken from the Stevenson house, and (3) his fingerprints were not found in any of the houses. Based on these similarities to the present crime, defendant argued that one could reasonably conclude Jackley was the killer and the principal burglar in this case.

PENALTY PHASE FACTS

### 1. The Prosecution

The prosecution presented evidence of defendant's three prior burglary convictions—in 1971, 1974, and 1976. The prosecution also presented evidence that defendant raped a female newspaper carrier early one morning in 1985. Defendant forced her to remove her clothing, to fellate him, and to engage in vaginal intercourse. He boasted in vulgar language to a co-worker later that day of having had sexual intercourse with the woman after robbing her.

### 2. The Defense

Members of defendant's family, former neighbors, a psychologist, and a psychiatrist, among others, testified he was subjected for several years to extreme psychological, physical, verbal, and sexual abuse by his stepmother. She often called defendant "a little bastard." She repeatedly beat him with sticks, belt buckles, and brushes and threw him down a flight of stairs with his hands tied. (His father also beat him.) She sometimes chained him to a basement post for several days, forced him to urinate and defecate in his underpants, and then beat him for that as well. She smeared his feces on his face and held his hands over flames. She once pulled his thumbs from their sockets. She forced him to eat fruit preserves until he vomited.

Dr. Lenore Walker, a licensed psychologist, testified to defendant's recounting of abuse by his stepmother. According to Dr. Walker, the stepmother told defendant she wanted him to look like a girl, she dressed him in

her daughter's panties and dresses and made him wash dishes while dressed like a girl. She tied a string around his penis, ". . . pulling it in back of him so that you couldn't see he had a penis in front of him, and tying the penis to his waist and telling him he looked better that way. . . . [¶] Then she moved into giving him enemas, using Vaseline and taking a tampon, at first just a clean tampon, and then she would use her own soiled, bloody tampons and insert them in his anus. . . . [¶] In addition, she would make him insert tampons in her vagina so she was having him touch her as well, and she would make him fondle her vagina area and have him lick her vagina area so she could reach a climax. . . . [¶] She would also masturbate him at that age—as he got older, some of it is progressing as he got older—between the two-year period of time of 10 and 12, but not allow him to reach an orgasm. When he was a little older and he would reach an orgasm, she would take the semen and smear it all over his face and he would be punished for that. In addition, in order to prevent him from reaching a climax, she would squeeze his testicles, and he remembers that being done with great pain to him. Later on, she would have intercourse with him and insert his penis in her vagina but not allow him to reach an orgasm."

Defendant was eventually taken from his family and lived in foster homes, mental hospitals, a youth authority facility in Nevada, and finally prison.

Dr. Walker further testified that she believed defendant had in fact been sexually molested as he described. She believed that because of his past he suffered a variety of mental maladies, including schizophrenia and disassociation, which in general might best be described as comparable to, but more severe than, post-traumatic stress syndrome. Dr. Walker stated that defendant is very confused, with guilt feelings and a need to be punished, and that his tendency to steal was not motivated by greed, but by a compulsion he could not control. Defendant told her he would often wake up in the middle of a burglary and not know what he was doing there.

John Cahill, a counselor at a Nevada youth camp where defendant had been incarcerated, testified, "Well, I'd say he was picked on by the other boys. He was—he was kind of a pitiful character and tended to be easily manipulated and generally picked on."

Dr. Ernest Noble, a psychiatrist employed by the California Department of Corrections, testified that he had examined defendant in 1971 during one of his incarcerations: "I felt that he had been brought up in a very highly chaotic home environment. And I felt his stepmother was extremely vicious to him. . . . I felt in some ways that she had set up a template in his head for prison or incarceration very early . . . ." Dr. Noble also observed that

defendant's thumbs appeared to be distorted, thus tending to confirm his description of having had them pulled from their sockets.

Dr. Stephen Wells, a clinical psychologist who examined defendant and reviewed his records, also testified to a lengthy history of abuse: "Given the nature, the prolonged administration and the severity of the mental, the physical, and the sexual abuse, I would say that taken all together, it was almost an impossible group of experiences to recover from. The physical abuse alone, which his stepmother admitted to me when I saw her in Utah itself, was profound and extreme. . . ." Dr. Wells further testified that defendant suffered severe emotional problems caused by the abuse.

Defendant had two minor children. Defendant's wife testified that he was a loving father. Dr. John Selden, a clinical psychologist, testified he had been treating defendant's five-year-old son for numerous behavioral problems. His son seemed very attached to him. Defendant's family was under great stress from medical and financial problems. Dr. Selden believed defendant was very concerned for his children's welfare.

## DISCUSSION

Defendant's primary contention on appeal is that he suffers from severe organic brain damage. Based on that assertion, he raises several arguments against the guilt verdict, the special circumstance finding, and the death sentence. Because the arguments based on alleged brain damage relate to all phases of the trial, we will first address defendant's other challenges directed only to the guilt phase. Second, we shall turn to the special circumstance and penalty phase issues that are not based on the brain damage allegation. Third, we shall resolve defendant's multiple contentions based on the alleged brain damage.

### Guilt Phase Issues Other Than Alleged Brain Damage

1. *Juror McCoskey*

On May 26, 1988, shortly before the trial's guilt phase began, Juror McCoskey telephoned the court clerk to say "she was not sure that she could fulfill her duties as a juror . . . [t]he nature of the case itself was very upsetting to her. . . ." The clerk noted that McCoskey "had broken down and was crying on the phone." On May 31, the court informed counsel of McCoskey's emotional outburst, recommended that she be excused, and asked counsel to stipulate accordingly. Defense counsel agreed and asked the court to seat an alternate juror. The prosecutor declined the court's request.

The court then questioned McCoskey about her ability to serve as a juror. She had an apparent change of heart, apologized for her emotional phone call, and stated that she believed herself to be able to serve. The court refused to seat an alternate juror. The proceeding was as follows:

"[Court]: Ms. McCoskey, my clerk received the phone call from you which she tells me you were very distraught about possible service on this case?

"[Juror]: I think I was kind of in a state of shock, but I'm all right—.

"[Court]: You no longer feel that you have any kind of disabling factors with regards to sitting on the case? What was it that troubled you?

"[Juror]: I—I think I was in a state of shock that I was on it. You said our possibilities were one in eight, and the seriousness of it, and I think—I think I could be fair.

"[Court]: You do realize—you've gone through the whole thing with us, and the private communication with you without all the other jurors present—that ultimately there may be a problem through serving and sitting in judgment of this defendant. Is that what's bothering you, and is that what caused you concern, the gravity of responsibility as a juror?

"[Juror]: Yes. And I had to—I really had to stop and think about that, but I'm okay—

"[Court]: Is there anything about the communication that we've talked to you privately, now, that you need to add to or any further concern?

"[Juror]: No.

"[Court]: So in a fair sense, if we sit through this case and you believe the person is not guilty, will you have any problem with voting not guilty?

"[Juror]: No.

"[Court]: And I'm talking about the trial we're about to start now?

"[Juror]: Right.

"[Court]: And if it turns out that you're convinced beyond a reasonable doubt that he's guilty from the evidence that you receive, would you have any problems in voting guilty?

"[Juror]: No, no problems.

"[Court]: Now once we get into the penalty phase of the trial, if we ever do, you know we're going to hear good things and bad things about the man's life. When we've finished with that you go through that weighing process in the end, if we ever get to that phase of the trial, will you have the ability to come back with a just verdict regardless of what the consequences may be?

"[Juror]: Yes.

"[Court]: So, in other words, if your conscience tells you that the appropriate verdict is life without parole, you can vote that way?

"[Juror]: Yes.

"[Court]: And if your conscience tells you that the death penalty is the appropriate verdict, you think you can vote that way, too?

"[Juror]: Yes.

"[Court]: Is there anything else, now, you need to discuss with the court?

"[Juror]: I'm very sorry, your honor.

"[Court]: Okay. All right. I don't mean to embarrass you, and because we've talked to you privately that shouldn't affect any of your decisions in any regard throughout this case. Okay?

"[Juror]: Okay.

"[Court]: I'm sorry that you became so emotionally charged with the responsibilities.

"[Juror]: I just didn't know if I would be, you know, able to—able to—the different things I heard, you know—not being fair, I know I could be fair.

"[Court]: Is there something at home that's going to be a problem?

"[Juror]: No.

"[Court]: . . . All right. Let me give you one last chance, now. If you want off this case, I have a suspicion that the attorneys will stipulate that you be excused. If you're satisfied that you can do the job, that's another thing.

"[Juror]: I feel I can do it."

■ Defendant contends Juror McCoskey was emotionally unable to fulfill her duties and that the trial court's refusal to dismiss McCoskey violated defendant's federal constitutional rights to due process (U.S. Const., 5th & 14th Amends.), an impartial jury (U.S. Const., 6th Amend.), and a reliable penalty determination (U.S. Const., 8th Amend.). We reject the contentions.

"A juror's inability to perform his or her functions . . . must appear in the record as a 'demonstrable reality' and bias may not be presumed." (*People* v. *Thomas* (1990) 218 Cal.App.3d 1477, 1484 [267 Cal.Rptr. 865], citing *People* v. *Collins* (1976) 17 Cal.3d 687, 696 [131 Cal.Rptr. 782, 552 P.2d 742]; *People* v. *Compton* (1971) 6 Cal.3d 55, 60 [98 Cal.Rptr. 217, 490 P.2d 537].) The record reflects no demonstrable reality that McCoskey was unable to serve as a juror. Moreover, under Penal Code section 1089, which allows a trial court to remove a juror on a finding of good cause, "The determination of 'good cause' in this context is one calling for the exercise of the court's discretion; and if there is any substantial evidence supporting that decision, it will be upheld on appeal." (*People* v. *Thomas, supra,* 218 Cal.App.3d at p. 1484.) Substantial evidence supports the trial court's determination that McCoskey could fulfill her duty. In response to careful questioning by the court, she made clear her belief that she could be impartial and able to serve despite her prior misgivings. In that circumstance, the trial court was within its discretion not to remove her from the jury. (*People* v. *Goldberg* (1984) 161 Cal.App.3d 170, 192 [207 Cal.Rptr. 431] [no good cause to discharge juror who ultimately recanted her initially claimed inability to judge impartially]; *People* v. *Franklin* (1976) 56 Cal.App.3d 18, 25-26 [128 Cal.Rptr. 94] [same].)

2. *Alleged Failure to Investigate and Preserve Evidence*

■■ Defendant contends the prosecution violated his right of due process by failing to preserve (or, as he puts it, by destroying) two critical pieces of exculpatory evidence. First, he asserts the victim's autopsy was inadequate because discolorations on the victim's hands were not excised and examined. Second, defendant contends the prosecution destroyed material exculpatory evidence by test-firing the rifle found at the crime scene.

As defendant acknowledges, trial counsel failed to object to the alleged shortcomings in the autopsy or the rifle testing. The objections are thus waived and cannot be raised on direct appeal. (Evid. Code, § 353; *People* v. *Gallego* (1990) 52 Cal.3d 115, 179-180 [276 Cal.Rptr. 679, 802 P.2d 169];

*People* v. *Coleman* (1988) 46 Cal.3d 749, 777-778 [251 Cal.Rptr. 83, 759 P.2d 1260].)

 We also reject these contentions on the merits. The federal constitutional guarantee of due process imposes a duty on the state to preserve only such ". . . evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, see *United States* v. *Agurs* [(1976)], 427 U.S. [97], at 109-110 [49 L.Ed.2d 342, 353-354, 96 S.Ct. 2392], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California* v. *Trombetta* (1984) 467 U.S. 479, 488-489 [81 L.Ed.2d 413, 422, 104 S.Ct. 2528], fn. omitted (*Trombetta*); *People* v. *Webb* (1993) 6 Cal.4th 494, 519-520 [24 Cal.Rptr.2d 779, 862 P.2d 779]; *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1233 [255 Cal.Rptr. 569, 767 P.2d 1047].) The state's responsibility is further limited when, as in the present case, the defendant's challenge is to ". . . the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." (*Arizona* v. *Youngblood* (1988) 488 U.S. 51, 57 [102 L.Ed.2d 281, 289, 109 S.Ct. 333].) In this circumstance, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Id.*, at p. 58 [102 L.Ed.2d at p. 289].) "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (*Id.*, at p. 57, fn. * [102 L.Ed.2d at p. 288].) Applying these principles to the two items in question, we find no constitutionally improper conduct by the police because the items had no then-apparent exculpatory value.

### A. *Discolorations on the victim's hands*

 Autopsy photographs showed discolorations on the victim's hands. The prosecution's pathologist testified on cross-examination that he could not determine whether these discolorations were bruises or whether they occurred close to the time of death because the discolored areas had not been excised from the victim's body and examined microscopically. Defendant contends this failure to examine the discolorations undermined his ability to substantiate his claim that the victim was shot in the heat of a struggle and that the killing was not intentional. He asserts the crime scene evidence, for example, the shattered rifle in the hallway, indicated a struggle and that bruises on the victim's hands would have been the "physical evidence necessary to link him [the victim] to that struggle."

Even with the benefit of hindsight, we are not persuaded the evidence would have had any meaningful exculpatory value. If an examination had revealed the victim's hands were bruised during the burglary, such evidence would not point necessarily to the conclusion he had struggled with defendant. Moreover, even that conclusion would have aided defendant only minimally, if at all. That the victim was struggling to protect himself or his home does not by itself negate the finding that he was intentionally killed. One could just as reasonably conclude to the contrary—that he was killed *because* he was struggling. The lack of exculpatory value is also demonstrated by defense counsel's argument to the jury. Emphasizing various aspects of the crime scene evidence in detail, counsel argued that the killing was not intentional. Counsel did not refer, however, to the discolorations on the victim's hands and did not suggest the victim had been bruised during the alleged struggle. Even if viewed in the light most favorable to defendant, the best that can be said is that the evidence of bruising might have had some minimal exculpatory value. That is not enough. The constitutional duty to preserve evidence is "limited to evidence that might be expected to play a *significant* role in the suspect's defense." (*Trombetta, supra,* 467 U.S. 479, 488 [81 L.Ed.2d 413, 422], italics added, fn. omitted.) We find to be far-fetched the notion that a jury would find anything significantly exculpatory in the fact, if it was a fact, that a resident was shot while struggling to defend himself and his home from a burglar. We therefore cannot conclude that the police were aware during their investigation of any exculpatory value in possible bruises on the victim's hands.

### B. *Test-firing of the rifle*

Defendant contends a test-firing of the rifle found in the victim's house destroyed material exculpatory evidence by precluding a determination whether the rifle had been fired by the victim on the day of the killing. We reject this contention for several reasons, including defendant's failure to establish as a factual predicate that the testing he seeks was not done. Stanley Slonina, employed as a firearms specialist in the Orange County Sheriff's crime laboratory, testified he recovered and examined the rifle at the crime scene on the day of the killing. Defense counsel did not ask Slonina on cross-examination if he checked the temperature of the rifle, smelled gunpowder, or conducted any other field examination to determine if the rifle had been recently fired. Even if we assume, however, that no such determination was made, defendant also fails to show the test-firing precluded the further testing he claims should or could have been done. Perhaps most obvious by omission is defendant's failure to establish the existence of any subsequent laboratory test that would have shown whether the rifle was fired on the day of the killing. Defendant cannot fairly charge the prosecution with precluding testing that may not have been possible.

Moreover, even if we assume to be true defendant's factual premise that the test-firing precluded further testing and that such testing would have shown the rifle was fired the day of the killing, defendant has failed to show the testing would have had any exculpatory value that would have reasonably been apparent to the police. (See, e.g., *People* v. *Webb*, *supra*, 6 Cal.4th 494, 518-520 [rejecting the defendant's contention that police should have preserved a revolver].) Evidence the rifle was fired the day of the killing would not have established it was fired by the victim—the key to defendant's claim. Moreover, we find most attenuated the notion that defendant could establish a lack of intent by showing a struggle based on the fact that the victim might have fired the rifle. As with the claim regarding the discolorations on the victim's hands, the victim's struggle to protect himself or his home does not itself negate the finding he was intentionally killed. Evidence that the rifle was fired the day of the killing would not have played "a *significant* role in the suspect's defense." (*Trombetta*, *supra*, 467 U.S. 479, 488 [81 L.Ed.2d 413, 422], italics added, fn. omitted.)

### 3. *Admission of Autopsy Report*

 Dr. George Bolduc, the pathologist who conducted the autopsy on the victim, did not testify. The prosecution instead called a pathologist who did not participate in the autopsy to testify regarding the autopsy report, which, despite defendant's objection, was admitted into evidence under Evidence Code section 1271, the business records exception to the hearsay rule. Defendant contends admission of the report was error for several reasons: (1) the prosecution failed to establish the autopsy report's trustworthiness; (2) Dr. Bolduc was not unavailable and should have been required to testify; (3) admission of the report into evidence without an opportunity for defendant to cross-examine Dr. Bolduc violated defendant's constitutional right of confrontation; and (4) the report contained inadmissible medical opinion. We conclude the report was properly admitted into evidence.

### A. *Trustworthiness*

Evidence Code section 1271 states that a document is admissible as a business record only if "[t]he sources of information and method and time of preparation were such as to indicate its trustworthiness." (Evid. Code, § 1271, subd. (d).) The proponent of the evidence has the burden of establishing trustworthiness. (*People* v. *Diaz* (1992) 3 Cal.4th 495, 534-535 [11 Cal.Rptr.2d 353, 834 P.2d 1171]; 3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 1726, p. 1681.) The trial court, however, has ". . . wide discretion in determining whether sufficient foundation is laid to qualify evidence as a business record. On appeal, exercise of that

discretion can be overturned only upon a clear showing of abuse." (*People* v. *Lugashi* (1988) 205 Cal.App.3d 632, 638-639 [252 Cal.Rptr. 434].)

We find no abuse of discretion in this case. Dr. Fukumoto, a pathologist who had worked in the same office as Dr. Bolduc, testified, albeit over defendant's confrontation-clause objection, regarding the autopsy procedures of the office and further testified that standard operating procedures were followed in the Stevenson autopsy and in the documentation of the autopsy. Moreover, the trial court was aware that Dr. Bolduc had apparently left the coroner's office under unfavorable conditions. Before the report was admitted into evidence, the testifying pathologist acknowledged on cross-examination that Dr. Bolduc had caused "quite a bit of consternation" in a prior murder case by basing his conclusion regarding the cause of death on a police report rather than on medical evidence. By admitting the report into evidence, the court impliedly found the report to be trustworthy nevertheless. The terms under which Dr. Bolduc departed the coroner's office and his asserted misconduct in a prior, unrelated case were facts for the trial court to consider—and, indeed, might even raise questions—but they did not mandate a finding that the autopsy report in this case was untrustworthy.

B. *Dr. Bolduc's unavailability*

Defendant contends admission of the report was error because it "was premised on the puzzling conclusion that Dr. Bolduc was unavailable." Defendant does not clearly explain the point of this assertion, but he seems to contend that because the report was not sufficiently trustworthy to be admitted under Evidence Code section 1271 his constitutional right of confrontation entitled him to cross-examine Dr. Bolduc regarding the report. (Evidence Code section 1271 itself states no requirement that the person who prepared the business record testify regarding its contents.) We rejected a similar contention in *People* v. *Clark* (1992) 3 Cal.4th 41, 158 [10 Cal.Rptr.2d 554, 833 P.2d 561], in which the physician who conducted an autopsy and prepared the report died before being called to testify about his report. A different physician was permitted, as in the present case, to testify about the report over the defendant's objection. We explained that the report was properly admitted into evidence as an official record under Evidence Code section 1280. Thus, "The contents of Dr. Carpenter's [the examining physician's] report were admitted under a 'firmly rooted' exception to the hearsay rule that carries sufficient indicia of reliability to satisfy the requirements of the confrontation clause." (3 Cal.4th at p. 159; see also *People* v. *Demes* (1963) 220 Cal.App.2d 423, 442 [33 Cal.Rptr. 896] [no error in allowing physician other than the examining coroner to testify regarding

autopsy report]; *People* v. *Wardlow* (1981) 118 Cal.App.3d 375, 388 [173 Cal.Rptr. 500] [same].)

The same principle obtains in the present case even though the report was admitted under Evidence Code section 1271, the business records exception to the hearsay rule, rather than under Evidence Code section 1280, the official records exception. "[T]he cases require the same showing of trustworthiness in regard to an official record as is required under the business records exception. . . . Section 1280 constitutes the law declared in these cases by explicitly requiring the same showing of trustworthiness that is required in Section 1271." (Cal. Law Revision Com. com., Deering's Ann. Evid. Code (1965 ed.) § 1280, p. 438 [citations omitted].) In light of our conclusion that the trial court was within its discretion in finding Dr. Bolduc's report sufficiently reliable to be admitted under Evidence Code section 1271, defendant's right of confrontation was not violated.

### C. *Medical opinion*

Defendant briefly asserts the autopsy report was inadmissible because it contained Dr. Bolduc's medical opinions, for example, the cause of the victim's death. We disagree for several reasons. First, defendant did not raise this objection at trial. Rather, he objected to admission of the autopsy report on the ground it was not subject to the business record exception under Evidence Code section 1271. The present objection, i.e., that the report contained Dr. Bolduc's opinions, is therefore waived.

Second, defendant even now does not specify the opinions to which he objects except Dr. Bolduc's opinion regarding the cause of death. We decline to address an objection to unspecified opinions.

Third, Dr. Bolduc's conclusion regarding the cause of death was not inadmissible opinion. (7) To be sure, some medical opinion has been deemed inadmissible under the business records exception of Evidence Code section 1271. (*People* v. *Reyes* (1974) 12 Cal.3d 486, 502-503 [116 Cal.Rptr. 217, 526 P.2d 225] [psychiatric opinion not admissible]; *People* v. *Terrell* (1955) 138 Cal.App.2d 35, 57 [291 P.2d 155] [physician's opinion that patient had criminal abortion not admissible].) The reasoning in those cases was that, to be admissible under the business records exception, the evidence ". . . must be a record of an act, condition, or event; a conclusion is neither an act, condition or event; it may or may not be based upon conditions, acts or events observed by the person drawing the conclusion. . . ." (138 Cal.App.2d at p. 57.) As the *Terrell* court explained, however, "It is true that some diagnoses are a statement of a fact or a condition, for example, a

diagnosis that a man has suffered a compound fracture of the femur is a record of what the person making the diagnosis has seen but this is not true where the diagnosis is but the reasoning of the person making it arrived at from the consideration of many different factors." (138 Cal.App.2d at p. 58; *People* v. *Reyes, supra,* 12 Cal.3d 486, 503 [holding inadmissible a subjective psychiatric opinion and noting the distinction made in *Terrell, supra,* 138 Cal.App.2d 35, 57].) ▇ The same reasoning obtains in the present case. Dr. Bolduc's conclusion regarding the cause of death—a bullet wound to the heart—was based on his direct observation and is no different in kind from a diagnosis of a broken femur, the example noted in *Terrell* of an observed fact. Indeed, all of Dr. Bolduc's relevant conclusions are of this type. He concluded in his report that: (1) "There is an entrance gunshot wound of the posterior left chest [i.e., the back]. . . ." (2) "This is a distant gunshot wound entrance. . . . The wound is free of gunpowder, burns or stippling." (3) The shot pierced the heart. (4) "The direction of the [bullet] track is forwards, up 45 degrees and left to right 10 degrees." None of these conclusions, including that regarding the cause of death, was inadmissible under Evidence Code section 1271.

Fourth, even assuming, solely for discussion, that Dr. Bolduc's conclusion regarding the cause of death—the only opinion to which defendant specifically objects—was inadmissible opinion, it was harmless. We note *People* v. *Williams* (1959) 174 Cal.App.2d 364 [345 P.2d 47], a murder case in which, as in the present case, a physician testified regarding the contents of an autopsy conducted by another physician. The court observed, "[T]he sole and only purpose served by the records in the trial was to establish the cause of death. Appellant certainly was not prejudiced by this testimony because neither at trial nor here, does he seriously challenge the fact that the life of the deceased was terminated by a gunshot wound." (*Id.,* at p. 391.) Likewise here, Dr. Bolduc's conclusion that the victim died from a gunshot wound to the heart is not disputed. Nor does defendant dispute Dr. Bolduc's conclusion that the victim was shot in the back. Similarly, criminalist Richard Brown testfied independently of the autopsy report that the distance from the gun muzzle to the victim was at least two feet. Admission of these conclusions was not prejudicial to defendant.

*Special Circumstance Issues Other Than Alleged Brain Damage*

Defendant contends the special circumstance finding of murder in the commission of a burglary (Pen. Code, § 190.2, subd. (a)(17)(vii)) must be set aside for three reasons: (1) improper instructions, (2) insufficient evidence, and (3) his alleged brain damage. We at this point address the instructions and evidence but will later discuss the brain damage contention in connection with the other issues related to that allegation.

Before proceeding, we note this case is subject to the holding of *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 153-154 [197 Cal.Rptr. 79, 672 P.2d 862] (*Carlos*), that a felony-murder special circumstance required proof of the defendant's intent to kill. We later overruled *Carlos* by holding that intent to kill must be charged and proved only where the defendant was an aider and abettor to the homicide and not the actual killer. (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1138-1147 [240 Cal.Rptr. 585, 742 P.2d 1306].) We subsequently held, however, that for crimes committed during the period between *Carlos* and *Anderson*, the *Carlos* requirement of an intent to kill would govern. (*People* v. *Fierro* (1991) 1 Cal.4th 173, 227 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) The killing in this case was during that period.

### 1. *Instructions on Special Circumstance*

A finding of implied malice is not sufficient to establish the intent-to-kill requirement of *Carlos, supra,* 35 Cal.3d 131. (*People* v. *Ramos* (1984) 37 Cal.3d 136, 148, fn. 3 [207 Cal.Rptr. 800, 689 P.2d 430].) Defendant contends the trial court incorrectly "left the impression that implied malice was sufficient to establish the requisite intent to kill." We are not persuaded.

The trial court instructed the jury with respect to the special circumstance as follows: "To find that the special circumstance, referred to in these instructions as murder in the commission of a burglary is true, it must be proved . . . that the defendant *intended to kill* a human being or intended to aid another in the killing of a human being. . . . [¶] The only evidence of whether defendant *specifically intended to kill* Mr. Stevenson is circumstantial evidence. You may only find that the special circumstance alleged is true if the proved circumstances are not only consistent with the theory that Mr. Beeler had *the specific intent to kill* Mr. Stevenson, but cannot be reconciled with any other rational conclusion. [¶] Also, if the evidence as to whether defendant had the required *specific intent to kill* Mr. Stevenson is susceptible of two reasonable interpretations, one of which . . . points to the existence of *specific intent* and the other of which points to the absence of *specific intent*, it is your duty to adopt that interpretation which points to the absence of *specific intent*." (Italics added.)

Defendant contends this instruction was insufficient in two respects. Before turning to the merits of those contentions, we note his acknowledgment that ". . . defense counsel did not object to the intent to kill instruction in the lower court." Defendant contends this failure to object does not constitute a waiver because under Penal Code section 1259, "The appellate court may also review any instruction given, refused or modified, even

though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." As we shall explain below, we find no merit to defendant's objections to the instructions. We therefore need not decide the procedural question of whether those objections were properly preserved under Penal Code section 1259. We note, however, that what defendant appears to be asserting is that the trial court should have explained the special circumstance instruction. ■ In the absence of a request, however, a trial court is under no obligation to amplify or explain an instruction. (*People* v. *Bonin* (1989) 47 Cal.3d 808, 856 [254 Cal.Rptr. 298, 765 P.2d 460]; *People* v. *Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366].) We shall nevertheless address the merits of defendant's contentions.

■ He first contends, barely in passing, "The court failed to explain that 'intent to kill' means the intent to take the life of a human being." This contention is belied by the record. As stated above, the special circumstance instruction included the explicit requirement that "the defendant intended to kill a human being. . . ."

Defendant more vigorously contends the trial court failed to instruct the jury that implied malice was not sufficient to establish a specific intent to kill and that the error failed to channel the jury's discretion, thus violating the Eighth Amendment to the federal Constitution. He points to the trial court's earlier instruction regarding the murder charge that, "When it is shown that a killing resulted from the intentional doing of an act with implied malice, no other mental state need be shown to establish the mental state of malice aforethought." Defendant contends the absence of an instruction that intent to kill requires more than a finding of implied malice may have caused the jury reasonably to conclude "that implied malice was sufficient to establish the specific intent to kill." We reject the contention. The special circumstance instruction did not refer to a killing with *malice* and thus would not have caused the jury to refer to the definition of malice as now suggested by defendant. Moreover, the special circumstance instruction repeatedly and explicitly referred to a "specific intent to kill." The earlier instructions regarding malice stated, " 'Malice' is express when there is manifested an intention unlawfully to kill a human being. [¶] 'Malice' is implied when the killing results from an unjustified intentional act, the natural consequences of which are dangerous to life, where it is shown that the defendant consciously disregarded the high degree of probability that the act would result in death." The language of the implied malice definition is simply not consistent with the notion of a specific intent to kill. Thus, even if the jury did refer to the definition of malice, nothing in that definition would have suggested that implied malice was congruent with a specific intent to kill.

Moreover, the prosecutor's closing argument foreclosed any realistic possibility of the jury not believing they had to find intent to kill for the special circumstance. "The defendant intended to kill the human being. Now, that is the difference between felony-murder and special circumstance." Describing a chart shown to the jury, he further explained, "As you can see, first of all, on the chart here with the counts and the crimes, I have 'felony-murder' in red down where 'special circumstance' is, I also have it in red up where 'murder' is, but under 'special circumstance' I have 'intent to kill' with that, and that is supposed to show the distinction between the two. [¶] You can find the defendant guilty of felony-murder in the first degree and conceivably, not even looking at these facts here, but conceivably find the defendant not, or the special circumstance not true, even though it's felony-murder related, because of the intent to kill; that [i.e., intent] is needed."

We reject defendant's contention the jury was perhaps misled by the instructions into finding the felony-murder special circumstance to be true based only on a showing of implied malice.

### 2. *Evidence of Specific Intent to Kill*

 Defendant contends the special circumstance is not supported by substantial evidence and thus violates the California and federal constitutional due process guaranties. He agrees, however, with respondent that the general standard of review of this factual question is whether " '. . . after viewing all the evidence in the light most favorable to the prosecution' any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." (*People* v. *Edwards* (1991) 54 Cal.3d 787, 813 [1 Cal.Rptr.2d 696, 819 P.2d 436].) Respondent asserts three reasons why the finding of a specific intent to kill is supported.

(1) Respondent contends defendant fired *two shots from a single-action revolver while standing inside the house.*—Defendant asserts the evidence does not show that both shots were fired from the revolver or that they were fired from inside the house. One bullet was retrieved from the victim's body; the other bullet was found lodged in a parked car across the street from his house. The bullet recovered from Tony's body was not fired from Tony's .22-caliber rifle but *could* have been fired from a .22-caliber single-action Ruger revolver similar to the one taken from Michael's bedroom. Thus, respondent is correct that the evidence supports an inference at least one shot was fired from the revolver. The bullet in the car, however, was extensively damaged by impact, and the only conclusion that could be drawn from laboratory testing was that the bullet was consistent with a .22-caliber long-rifle projectile. That bullet could have been fired from either Michael's

revolver or Tony's rifle. Defendant is therefore correct that respondent overstates the evidence by asserting it establishes that two shots were fired from the revolver. Respondent is likewise too expansive in asserting that the evidence establishes the two shots were fired from inside the house. There was only a single bullet hole in the front screen door.

Although the evidence does not mandate the inferences on which respondent relies, it does permit those inferences. The fact there was only one bullet hole in the screen door does not necesarily refute the inference that both shots were fired from inside the house. One of the shots could have been fired while the door was open or while the shooter was perhaps standing in the doorway. Trajectory testing showed that "It was consistent for someone to have fired a weapon inside the residence, have a clear line of fire and hit the car out in front of the residence." This clearly permits the inference that at least one shot was fired from inside the residence. Moreover, in connection with the same test, police found in the front lawn an indentation directly underneath the string used to measure the trajectory, "a rounded portion where it appeared something had fallen down, possibly a knee, right into the lawn underneath the string. And then right next to the indentation, the rounded portion, there was a disturbance where the grass had actually been pulled up." The lawn indentation permitted the inference the victim was shot and fell in the line of trajectory from the house to the car. This, in turn, would support the inference that both shots were fired from the same location, i.e., from inside the house. Moreover, the bullet retrieved from the victim's body could have been fired from the revolver, and the bullet from the car was the same type of projectile as the bullet retrieved from the victim's body. The foregoing evidence taken as a whole clearly permits the inferences that two shots were fired from the revolver and that they were both fired from inside the house. Most important, the dispute over how many shots were fired from which weapon and from what location is largely beside the point. At a bare minimum, the record supports inferences that defendant fired two shots, one of which struck the victim in the back.

(2) Respondent contends the victim was shot in the back *while fleeing from defendant,* who was in the act of burglarizing the victim's home.— Defendant contends there is no credible evidence of where the victim was when he was shot. Defendant points to testimony by the prosecution's pathologist that he could not state "the exact position the gun was in when the gun was fired or the exact position the deceased was in when the gun was fired." Defendant seems to suggest that the victim may have been shot inside the house rather than outside on the lawn and that, if he was shot inside, that fact would support the theory of a struggle with defendant, which might

negate specific intent. The evidence at least equally, however, also supports the inference sought by the prosecution. Defendant's contention is also beside the point. The evidence showed the victim was shot in the back from a distance of at least two feet. This plainly supports an inference that he was shot while fleeing.

(3) Respondent contends the fatal shot *pierced the victim's heart.*—To be sure, the precise location of the internal wound does not by itself necessarily establish that defendant aimed for the victim's heart or that he intended to kill, but this evidence does at least permit that inference. That is sufficient. Moreover, the far more persuasive fact is that the victim was shot in the back in the area of the heart. Evidence the bullet pierced the heart added little to the prosecution's case.

In short, differing inferences could have been drawn from the evidence, and the jury might have found the special circumstance not to be true, perhaps based on defendant's suggestion there was a struggle or on some other theory. But that is not the point. If the evidence reasonably justifies the finding of the jury, the reviewing court's opinion that the evidence could also be reconciled with some contrary view does not warrant a reversal of the finding. (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 316-320 [61 L.Ed.2d 560, 571-574, 99 S.Ct. 2781].) We hold the special circumstance finding is amply supported by substantial evidence.

*Penalty Phase Issues Other Than Alleged Brain Damage*

1. *Death of Juror Coley's Father*

Defendant contends the penalty verdict was coerced because the trial court improperly required a juror to continue deliberating despite his father's death. On Tuesday, July 12, 1988, after two days of penalty deliberations, one of the jurors, Michael Coley, informed the court by telephone that the juror's father had died. The following proceeding took place later that morning in the judge's chambers outside the presence of counsel for both sides:

"The Court: Juror Coley called in this morning, indicated there was a death in his family. Other than that, no other formal message other than he expected to fly out of state at two o'clock in the afternoon today. I asked the clerk to get hold of him and find out the particulars of it. Court called both counsel. Neither have honored their 20-minute call. They've gone to Westminster Court. The court has been able to contact one of the parties, I believe, and they were beyond an hour limit. The court is going to cause the

jury to begin deliberations again. I'm simply making a record of the information I've received from this juror, and that is that the family member that is deceased is his father, they have a close relationship, he needs to be there, and he will be back—Monday?

"Juror Coley: Monday.

"The Court: The court's going to cause the jury to begin deliberations again and we'll recess early for the convenience of this juror, sometime before noon. And after I speak to the attorneys, the probability is that I will not excuse this juror and will not place an alternate in his seat and will expect that we will begin deliberations again on Monday. So even if the attorneys do not show, that is the information that Mr. Coley will have and he will be required to come back on Monday, unless there's some other severe family problem that you notify us of by phone. Okay?

"Juror Coley: Okay."

Shortly thereafter, about 10:20 a.m., all counsel arrived, and the court provided them with a transcript of the earlier conference between the court and Juror Coley. Defense counsel expressed concern: "Mr. Barnett: I ask the court to seat the alternate juror. I'm afraid that by terminating deliberations sometime before noon the jury may feel some sense of urgency in reaching a verdict today. Or if they don't reach a verdict today, that if they have to come back next week that's going to put them beyond our estimate and they may feel forced to reach a verdict." The estimate to which counsel referred was the court's earlier representation during jury selection that "It's possible that we could go a couple of weeks into July and the outermost probability is that the middle of July would terminate the responsibility of the juries [*sic*] on the case." The Monday on which the court proposed to resume deliberations would have been July 18.

Defense counsel and the prosecutor then explained they had arrived a few minutes late for the meeting with Juror Coley because they had been together in another courthouse. The court responded: "Excellent. I'm not angry at you folks. . . . Had the court known that, I wouldn't have talked to the juror privately." Defense counsel then explained his concern that the juror might draw a negative inference from the court's comment to the juror that counsel had not appeared in response to the court's call. The court agreed: "You're probably right. What would you ask the court to do?"

Counsel requested that the juror be excused, explaining that his primary concern was not the prior reference to counsel's absence, but the effect of allowing Juror Coley to continue deliberations:

"Mr. Barnett: The problem is, your honor, that the court gave him no instructions as to, I suppose—that's how to deal with the other jurors with respect to his present problem. In other words, we don't know what he's told them; that he's informally told them, hey, we're gonna be off, or I have to catch a . . . plane at 2:00, or I have to come back next week if we don't reach a verdict this morning. What time was the court planning on excusing the jury today?

"The Court: In 20 minutes.

"Mr. Barnett: One additional point or argument for the excusal of Mr. Coley, is that there's no way to predict the impact of the death of a family member, no way for counsel, the court, or the juror himself, the effect that may have on him in the penalty phase of a death case."

The court stated it would reconvene the jury in open court at 11 a.m. to clear up any misimpression about why counsel had not been present earlier. Before that time, however, the jury returned a verdict. Defendant reiterated his objection that the verdict had been coerced. The court overruled the objection, stating "I don't believe there's any factor of coercion." The court then queried the jury:

"The Court: Prior to the court inquiring about the verdict, the court is aware that juror number eight, Mr. Coley, had a death in his family and that he was going to have to leave the area at two o'clock this afternoon. Did any of the jurors feel the pressure of that incident in arriving at your verdict? Directed at Mr. Wilcox the foreman.

"Jury Foreman: No, I don't believe so, your honor.

"The Court: If any juror now feels that they need additional time to discuss the case or reconsider the verdict because of the pressure of time, I'll hear from any juror. Any juror that has a feeling like that, please raise your hand. Did the fact that Mr. Coley was going to be excused and there was a probability that we would begin the case anew on Monday the 18th, have anything to do with the verdict that you've reached, Mr. Wilcox?

"Jury Foreman: No, Sir.

"The Court: Do any of you feel in any way differently than that, that there might be some impropriety in the verdict because of the press of time? If so, please raise your hand."

██ Defendant contends the trial court's handling of this matter constituted error in two respects. His primary contention is that Juror Coley

should not have been allowed to deliberate further that day and that the penalty verdict was coerced under the circumstances. He also asserts the trial court "committed constitutional error in engaging in a private conversation with a juror outside the presence of Beeler or his counsel." There was no error.

 A trial court's decision whether to discharge a juror for good cause under Penal Code section 1089 is subject to review under the abuse-of-discretion standard. (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 986-987 [2 Cal.Rptr.2d 112, 820 P.2d 214] (*Ashmus*); *In re Mendes* (1979) 23 Cal.3d 847, 852 [153 Cal.Rptr. 831, 592 P.2d 318] (*Mendes*).) Nothing in the record shows an abuse of discretion in this case. To the contrary, the court accommodated Juror Coley to the fullest extent by offering to recess the trial and to truncate deliberations on the day in question so that he could leave town. Likewise, the trial court was in the best position to observe the juror's demeanor. Nothing in the record indicates there was any communication between the court and Coley that was not included in the record but which might have cast doubt on Juror Coley's ability to proceed. Penal Code section 190.9 requires that all proceedings in a capital case must be conducted on the record with a court reporter present. "It is presumed that official duty has been regularly performed." (Evid. Code, § 664.) The presumption obtains in this case.

We do not suggest that a more detailed inquiry by the court would have served no purpose. For example, if Juror Coley had been questioned regarding his state of mind or if he had stated affirmatively on the record his ability and willingness, or lack thereof, to proceed, such information would assist us in determining whether the trial court abused its discretion in allowing Coley to continue deliberating. Although such inquiry is preferred, it is not required. As we explained in *Ashmus, supra,* 54 Cal.3d 932, 987, a hearing is not required in all circumstances. The court's discretion in deciding whether to discharge a juror encompasses the discretion to decide what specific procedures to employ including whether to conduct a hearing or detailed inquiry. (Accord, *Mendes, supra,* 23 Cal.3d 847, 852.)

Moreover, the record supports no inference that Juror Coley was coerced. He did not request to be discharged. Neither did he object to the trial court's decision to allow deliberations to continue briefly. To accept defendant's claim of jury coercion, we would have to assume without any evidence in the record that Juror Coley was so distracted by his father's death that he felt compelled to return a speedy verdict or that other jurors were aware of the situation and were somehow affected by it. We may not properly make such assumptions. The inability to perform the functions of a juror " '. . . must

appear in the record as a demonstrable reality . . . .' " (*Mendes, supra,* 23 Cal.3d 847, 852, quoting *People* v. *Compton* (1971) 6 Cal.3d 55, 60 [98 Cal.Rptr. 217, 490 P.2d 537].) Nothing in the record shows a "demonstrable reality" that Juror Coley was unable to discharge his duties or that he felt coerced to return a verdict. We reiterate that the record does not indicate a request by Juror Coley to be discharged or even to be accommodated by not having to deliberate that day. Moreover, Juror Coley already had reserved a flight when he informed the court of his father's death. The court made clear that Juror Coley would be allowed to leave sufficiently early that day to travel to the airport for his flight. Coley agreed to the court's proposal. Nothing in the record suggests that Coley asked for additional time, disagreed with the court's proposal, or was subjected to any time pressure. Similarly, the record does not indicate that any other juror was affected by the circumstances.

We have not previously had the same situation before us, i.e., a case in which a juror continued deliberating after a family death, but we have dealt with the converse, i.e., a juror who was discharged because of a family death. In *Mendes, supra,* 23 Cal.3d 847, the defendant objected to the trial court's having excused without a hearing a juror who requested to be excused because his brother had died the previous night. In a later capital case, the trial court summarily discharged during penalty deliberations a juror whose mother had died the preceding night. (*Ashmus, supra,* 54 Cal.3d 932, 986-987.) We upheld the discharge in both cases, but those results do not support defendant's claim of coercion in this case. In both those cases, the jurors requested discharge from the jury. The issue in both was whether the trial court abused its discretion in granting the juror's request. We held in both cases that a hearing to determine good cause for the discharge was not required because good cause was so clearly established under the circumstances. By contrast, Juror Coley did not request to be discharged or even that deliberations not resume the day he informed the court of his father's death.

Apparently, defendant would have us assume as a matter of law that the death of a juror's parent is so debilitating that the juror is presumptively unable to deliberate. Perhaps some jurors would be thusly affected. We do not gainsay the intuitive conclusion that a person is likely saddened by the death of his or her parent. Indeed, we have recognized that a family death can be difficult for a juror. (*Mendes, supra,* 23 Cal.3d 847, 852; *Ashmus, supra,* 54 Cal.3d 932, 987.) That recognition does not mean that every juror is equally affected or that such difficulty, even when it arises, necessarily renders the juror unable to perform his or her duties.

 We need only briefly note defendant's secondary contention that the trial court erred by engaging in an ex parte communication with Juror

Coley. (This contention seems directed to the fact of the communication rather than to its substance. To the extent defendant objects to the substance of the communication, that objection relates to the alleged coercion of Juror Coley. We have rejected that contention as explained above.) If, as defendant contends, albeit without any support in the record, Coley was distressed and had a pressing need to arrange his affairs, the situation might have been exacerbated if the court had refused even to speak with him until counsel arrived at the court. It is simply not error for a trial court to engage in a brief, administrative communication when informed of a death in a juror's family. Reality and common sense dictate that a court be allowed to learn what has happened. (See, e.g., *Ashmus, supra,* 54 Cal.3d 932, 986-987; *Mendes, supra,* 23 Cal.3d 847, 852.) Of course, a court at some point might err by going beyond what is administratively necessary, but that point was not reached in this case.

### 2. *Effect of Death Penalty on Defendant's Family*

██ Defendant contends the trial court erred by refusing to allow defendant's counsel to examine Robert Lippold on the effect of a death penalty on defendant's family. Lippold was a licensed clinical psychologist. (He performed a psychological evaluation of defendant's mother in 1964 for the juvenile court in Salt Lake City, Utah, and he testified in the present action regarding that evaluation. That portion of his testimony is not relevant to this issue.) Lippold later worked in the State of Nevada prison system for nine years as a psychologist, superintendent of a women's prison, and warden of a maximum security prison. He testified he had the opportunity during this period to interview the families of people on death row.

We have not previously decided explicitly whether evidence of the effect of a death penalty on the defendant's family is "constitutionally pertinent mitigation" evidence. (*People v. Cooper* (1991) 53 Cal.3d 771, 844, fn. 14 [281 Cal.Rptr. 90, 809 P.2d 865]; *People v. Fierro, supra,* 1 Cal.4th 173, 241; *People v. Bacigalupo* (1991) 1 Cal.4th 103, 143 [2 Cal.Rptr.2d 335, 820 P.2d 559].) Again, we need not decide this because, even if such evidence might otherwise be admissible, Lippold's proposed testimony was not admissible because he had no personal knowledge of defendant's family. The most that Lippold could have stated would have been his opinion regarding the effect on those families of whom he did have personal knowledge. This would have been an opinion regarding the death penalty in general. Such an opinion would not be relevant to the proper inquiry, which is to tailor the defendant's punishment "to his *personal* responsibility and moral guilt." (*Enmund v. Florida* (1982) 458 U.S. 782, 801 [73 L.Ed.2d 1140, 1154, 102 S.Ct. 3368], italics added.) "The focus in a penalty phase trial of a capital

case is on the character and record of the individual offender." (*People* v. *Johnson, supra,* 47 Cal.3d 1194, 1249.) The court did not err in excluding Lippold's proposed testimony based on his experience with other families.

### 3. Seizure of Defendant's Written Notes

■ According to defendant, he spent considerable time at his trial counsel's request preparing an approximately 50-page manuscript of his life story for use during the penalty phase, but the document was taken by jailers from his prison cell. (Respondent does not dispute defendant's statement of the facts regarding the seizure.) Counsel, who had not seen the manuscript, brought this to the court's attention at an in camera proceeding from which the prosecutor was excluded. The court ordered that the manuscript be produced and kept under seal by the court.

Defendant's appellate counsel assert they requested the manuscript after trial, but that the court was unable to produce it. Defendant contends the seizure and loss of the manuscript deprived him of an opportunity to present a complete defense during the penalty phase. He further contends the loss was irreparable because his alleged serious brain damage raises a question of whether he has the ability to reproduce the work.

Before turning to the merits, we first explain the status of the record. Defendant is correct that the trial court ordered defendant's jailers to place the manuscript in the court's custody so that it could be kept under seal. Later, on March 19, 1990, appellate counsel filed a request to review the transcripts of all in camera proceedings, including the November 13, 1987, hearing at which the court ordered production of the manuscript. The trial court's order did not purport to grant or deny the request but stated that all in camera transcripts had been forwarded to this court. Defendant moved for reconsideration. The trial court denied that motion, again stating that the transcripts had been sent to this court. After further investigation and communication with this court, defendant again sought reconsideration, correctly explaining that no transcripts had been sent to this court. This was confirmed by the superior court clerk. Finally, the trial court granted defendant's request to review the manuscript that had been placed under seal.

According to defendant, however, the manuscript was still not produced. The trial record contains no further references to this matter, so defendant's assertion cannot be verified. Relying on this omission, respondent contends we should not address the issue of the seized manuscript. Although respondent is technically correct that the record does not prove the manuscript was withheld from appellate counsel, we have no reason to doubt appellate

counsel's assertion they were not provided with the manuscript. Indeed, respondent does not dispute that the manuscript has been lost, either by the jail or the trial court. In light of the uncertainty, which appears not to be attributable to defendant's counsel, we shall address the claim on the merits.

Assuming that, as defendant contends, the manuscript was never produced to his appellate counsel, we nevertheless reject the claim on the merits. Defendant contends that, but for the seizure of the manuscript, it would have been available for his defense at trial. This assertion, however, assumes it was in fact not available for his defense. As explained above, the trial court ordered the jailers to submit the manuscript to the court. Although the manuscript may now be missing, we decline to speculate whether it was unavailable to counsel during trial. Nothing in the record suggests that *trial counsel* ever requested the manuscript during the penalty phase. We thus find no error.

Moreover, if trial counsel had so little interest in the manuscript that they did not even seek to read the manuscript themselves, we see no merit in defendant's contention *on appeal* that the manuscript's seizure somehow restricted his penalty phase defense. Thus, the seizure, even if improper, did not prejudice defendant. Prejudice is lacking in other respects. First, appellate counsel contend defendant suffers from severe organic brain damage, which raises serious concerns about his ability to reproduce that work product. This assertion assumes as a fact that defendant is brain damaged. Moreover, the assertion of prejudice is important for what it does not say. Appellate counsel do not contend defendant attempted to rewrite or reconstruct the life story that was allegedly the subject of the manuscript. The contention is only that he *may* have been unable to do so. That is not a showing of prejudice. (It also seems a bit stretched to contend that defendant, although brain damaged, composed a 50-page life story but that the same brain damage precluded him from doing so a second time.) Second, counsel do not assert that the manuscript would itself have been admissible, but only that it would have assisted counsel at trial. Counsel fail to explain to this court why trial counsel could not have obtained the same information regarding defendant's background by interviewing him. Third, defendant does not point to any mitigating evidence that he was unable to introduce as a result of the seizure of the manuscript. Put differently, he does not show how the manuscript was material or irreplaceable.

4. *Alleged Cumulative Guilt Phase Errors Affecting Penalty Verdict*

Defendant contends there were multiple errors during the trial's guilt phase that raised serious questions about the finding that he intentionally

killed the victim. In particular, he points to: (1) the absence of substantial evidence that defendant intentionally killed Tony, (2) the prejudicial failure to present evidence of defendant's organic brain damage, (3) improper instruction on the intent-to-kill requirement of the felony-murder special circumstance, (4) improper destruction of exculpatory evidence, and (5) the seizure of the life story manuscript from his cell. (The last assertion is curious because defendant raises the alleged seizure only in connection with the penalty phase. In this portion of his brief, however, he seems to contend it was guilt phase error.) Defendant contends "there is a reasonable **possibility** that a penalty jury would return a verdict other than death," absent these errors. (Boldface in original.) Defendant does not, however, explain with any particularity *how* these alleged errors affected the penalty verdict other than to say that they cast doubt on the finding that he intentionally killed the victim. That argument relates, not to the penalty determination, but to the special circumstance finding itself. In short, the point of defendant's argument is not clear. In any event, it is misplaced because we have rejected these claims of guilt phase error. If none of the claimed errors were individual errors, they cannot constitute cumulative errors that somehow affected the penalty verdict. Finally, as we have often noted, defendant " 'is entitled to a "fair trial not a perfect one." ' " (*People* v. *Miranda* (1987) 44 Cal.3d 57, 123 [241 Cal.Rptr. 594, 744 P.2d 1127], quoting *Schneble* v. *Florida* (1972) 405 U.S. 427, 432 [31 L.Ed.2d 340, 345-346, 92 S.Ct. 1056].) If defendant means to suggest the guilt phase was somehow so flawed that it was unfair and thereby influenced the penalty verdict, we reject that contention as well.

### 5. *Death Penalty as Disproportionate*

Defendant contends the death penalty is disproportionate to his crime and circumstances and thus violates the constitutional proscriptions of cruel and unusual punishment. (U.S. Const., 8th & 14th Amends; Cal. Const. art. I, § 17.) We disagree. The jury found that he was the actual killer and that he intended to kill. "Accordingly, the imposition of the penalty of death on defendant does not violate the Eighth Amendment." (*People* v. *McLain* (1988) 46 Cal.3d 97, 121, fn. 7 [249 Cal.Rptr. 630, 757 P.2d 569].)

The facts do not cast doubt on this general proposition. Defendant points to the following aspects of the killing: "Beeler had no prior history of violent crimes. There were no eyewitnesses to the killing. Beeler did not know the victim. There was no evidence the burglar was armed when he entered the victim's house. The prosecution conceded that Stevenson returned home during the course of a burglary and attacked the burglar with his rifle, with sufficient force to cause a large gash in the door of Michael Stevenson's

room. There was substantial evidence of a struggle between the victim and his killer, and the victim was shot once with a handgun owned by the victim's brother. The prosecution even acknowledged that the intruder left the victim's house without knowing whether the victim was dead or simply wounded."

Defendant's characterization of the evidence is flawed. The assertion that defendant had no history of violent crime is false and misleading. It is false because he had previously robbed and raped a woman. That is violence. Defendant's view is misleading to the extent it suggests a law-abiding life because he had three burglary convictions. More important, even if we otherwise accept defendant's characterization of the facts, these are hardly circumstances that demonstrate, or even suggest, the death penalty is inappropriate. Rather, they tell a story of a killer who entered the home of an innocent stranger and burglarized it. The resident inadvertently returned home, interrupted the crime, and, after struggling, was shot in the back. The killer left the victim to die.

Defendant also contends the death penalty is inappropriate and "shocks the conscience" in light of his horrible childhood, his brain damage, his efforts to provide for his family, and the fact that his most recent prior conviction was nine years old. We are not persuaded. Neither his childhood, his own family's circumstance, nor his interlude from crime renders disproportionate a death penalty for this defendant's killing of this innocent victim under the circumstances of this case. We consider separately the alleged brain damage (*post*, at pp. 1001-1010), but at this juncture we need note only that (1) there is insufficient evidence in the record on appeal to support the conclusion that defendant does in fact suffer organic brain damage; and (2) evidence of brain damage would not *necessarily* render the death penalty cruel or unusual. (*People* v. *Poggi* (1988) 45 Cal.3d 306, 348 [246 Cal.Rptr. 886, 753 P.2d 1082]; cf. *Penry* v. *Lynaugh* (1989) 492 U.S. 302, 330-335 [106 L.Ed.2d 256, 285-289, 92 S.Ct. 1056] [Execution of a mentally retarded defendant is not categorically prohibited by the Eighth Amendment.].) Moreover, we know nothing from the record in this case of the specifics of the alleged damage and what effect, if any, it might have had on defendant's mental state or actions.

6. *Alleged Penalty Phase Instructional Errors*

Defendant asserts three errors in the penalty phase jury instructions. He first contends the trial court incorrectly "left the impression that implied malice was sufficient to establish the requisite intent to kill" for the felony-murder special circumstance. That contention is more properly considered in

connection with the guilt and special circumstance issues, and we have rejected it in that part of the opinion. (*Ante*, at pp. 982-986.) We turn now to defendant's two remaining contentions.

### A. *Alleged confusion of aggravating and mitigating factors*

 The trial court instructed the jury with the 1986 revision of CALJIC No. 8.84.1, which set forth the factors for the jury to consider in rendering its penalty verdict. The instruction included the language of Penal Code section 190.3, factor (k) (hereafter factor (k)), which directed the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. . . ." "The language of factor (k) refers to circumstances which extenuate the gravity of the crime, not to circumstances which enhance it." (*People* v. *Boyd* (1985) 38 Cal.3d 762, 775 [215 Cal.Rptr. 1, 700 P.2d 782].) Defendant does not object to CALJIC No. 8.84.1. He contends, however, the court erred by giving an additional instruction that "The list of factors which I have just read to you contains every aggravating factor which you may consider." He asserts this statement wrongly instructed the jury that factor (k) could be an aggravating factor as well as a mitigating factor. We are not persuaded.

Defendant requested the additional instruction to which he now objects. Respondent contends the error, if any, was therefore invited. We need not decide whether there was invited error because the instruction of which defendant now complains was not error. As defendant explained in requesting the instruction, it was a correct statement of the law to the extent it made clear the jury could consider only those aggravating factors identified in CALJIC No. 8.84.1. (*People* v. *Boyd, supra*, 38 Cal.3d 762, 775.) Nor can the additional instruction reasonably be read even to suggest that factor (k) could be considered as an aggravating factor. To be sure, as the trial court noted, the proposed instruction could have been more clearly written. "The second sentence in defendant's proposed [instruction] two is inaccurate which reads 'In other words, the factors I have just read to you are the only factors you may consider in aggravation'—because there are factors in mitigation also there." The court, however, deleted this sentence with defendant's consent. Nothing in the remainder of defendant's additional instruction could fairly be taken to mean that factor (k) could be an aggravating factor. The factor (k) instruction itself negated any such meaning. The jury was instructed that factor (k) was "any other circumstance which *extenuates* the gravity of the crime even though it is not a legal excuse for the crime and

any *sympathetic* or other aspect of the defendant's character or record *that the defendant offers as a basis for a sentence less than death,* whether or not related to the offense for which he is on trial." (Italics added.) The language of factor (k) could not, even with the additional instruction, have led a juror to view factor (k) evidence as an aggravating factor. The possibility of the confusion now asserted by defendant was further negated by the giving of his proposed instruction that: "The absence of any particular mitigating factor is not an aggravating factor, and you must not consider the absence of any of the enumerated mitigating factors as a factor in aggravation." In short, to accept defendant's view, we would have to conclude that a juror would believe that he or she was to consider extenuating evidence as aggravating evidence. We reject that view as being unrealistic. ▮ The proper standard for scrutinizing ambiguous jury instructions is to inquire ". . . whether there is a reasonable likelihood that the jury misconstrued or misapplied the words . . . ." (*People* v. *Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].) There was no such likelihood in this case.

### B. *Refusal of defendant's proposed instruction on weighing*

Defendant asserts error in the trial court's refusal to deliver his proposed jury instruction No. 10, which stated, "You may return a verdict of life imprisonment without the possibility of parole even if the aggravating factors you find [to be] true outweigh the mitigating factors you find to be true. This is so because your sympathy or compassion for the defendant or for his family, or any other single mitigating factor, can, standing alone, justify a sentence of life imprisonment without the possibility of parole." The refusal was not error. We rejected a similar argument in *People* v. *Edwards*: "Defendant also contends the court erred in refusing his request to instruct the jury, 'If you determine that the aggravating factors substantially outweigh the mitigating factors, you *may* return a finding of death *or* a finding of life in prison without the possibility of parole.' (Italics added.) In *Boyde* v. *California* [(1990)] 494 U.S. [370] at pages 376-377 [108 L.Ed.2d at p. 326, 110 S.Ct. at pp. 1195-1196], the high court upheld an almost diametrically opposite instruction—that the jury 'shall impose' the death penalty if it concluded that the aggravating circumstances outweigh the mitigating circumstances. We expressed misgivings about the word 'shall' in *People* v. *Brown* [(1985)] 40 Cal.3d at pages 544-545, and footnote 17, and recommended that future courts instruct as was done in this case. We have never suggested the instruction now urged was required." (*People* v. *Edwards, supra,* 54 Cal.3d at p. 842.) The instruction requested by defendant in the present case was not materially different from the one we held was not required in *Edwards.* We adhere to the same view and conclude the trial court properly refused the instruction.

### 7. · Assorted Previously Rejected Claims

Defendant briefly asserts six additional claims that he acknowledges "have been rejected in recent opinions of this Court." Two of these issues relate to defendant's alleged brain damage, and are resolved by our decision on that issue. (*Post*, at pp. 1001-1010.) We reiterate our rejection of these contentions as follows:

#### A. Legal aliens

Defendant contends the trial court erred in denying his motion to include lawful resident aliens in the jury pool. We have held that resident aliens are not a cognizable group that is constitutionally required to be included in the jury pool. (*Rubio* v. *Superior Court* (1979) 24 Cal.3d 93, 98-100 [154 Cal.Rptr. 734, 593 P.2d 595]; see also Code Civ. Proc., § 203, subd. (a)(1) [disqualifying "[p]ersons who are not citizens of the United States"].)

#### B. Intercase proportionality

Defendant contends the absence of any mechanism for intercase proportionality review denies him the opportunity to show his sentence violates the Eighth Amendment's proscription of cruel and unusual punishment. (U.S. Const., 8th Amend.) We consistently have held that such review is not constitutionally mandated. (*People* v. *Fierro, supra*, 1 Cal.4th 173, 253.)

#### C. 1978 sentencing statute

Defendant contends the 1978 capital sentencing statute is unconstitutional because it lacks the following safeguards: (1) identification of the aggravating and mitigating factors, (2) written jury findings regarding the aggravating and mitigating factors, (3) a burden of proof on the prosecution to establish all aggravating factors beyond a reasonable doubt, and (4) jury unanimity regarding the aggravating factors. We have rejected each of these contentions. (*People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1265 [278 Cal.Rptr. 640, 805 P.2d 899] [identification of factors not required]; *People* v. *Cox* (1991) 53 Cal.3d 618, 692 [280 Cal.Rptr. 692, 809 P.2d 351] [no constitutional requirement of written findings, jury unanimity, or proof beyond a reasonable doubt].)

#### D. Destruction of Beeler's juvenile records

Defendant contends the trial court erred by not dismissing the special circumstance allegation as a sanction for the destruction of defendant's juvenile records in Nevada. Defendant had been a resident of that

state's Spring Mountain Youth Camp for approximately nine months in 1967 and 1968. Defendant made an offer of proof that in approximately the winter of 1969, all of defendant's records from that camp were intentionally burned. Despite a Nevada statute that seemed to require the sealing and retention of all records after the subject juvenile reached the age of 24 years, the youth authority had a policy of destroying the records at that time. (The parties to this action disputed whether the destruction was lawful.) According to defendant, the destroyed records would have provided mitigating evidence regarding his troubled background, abused childhood, and perhaps other circumstances.

The trial court denied the motion, reasoning as follows: "People versus Zamora [(1980)] 28 Cal.3d 88 [167 Cal.Rptr. 573, 615 P.2d 1361], tells us not every suppression of evidence requires a dismissal. The remedies, if any, need only assure the defendant of a fair trial. Lawful and proper destruction require no sanctions. Illegal and malicious destruction may result in a dismissal. The sanction depends on the materiality of the evidence suppressed, or degree of materiality of the evidence suppressed. Finally, the court must consider the impact of the sanctions upon future cases and future police conduct. The sanctions, if any, must outweigh any benefit that the prosecution gains from the suppression. At the same time, the court must consider the public interest in law enforcement and a sanction that prevents the trial, or appropriate punishment, should be considered carefully. In this case the destruction of records has no sinister conduct attending the destruction. No governmental evil can be cured by dismissing the penalty phase proceedings. The records of Spring Mountain Juvenile Court were destroyed by burning in an effort to maintain confidentiality, at least as indicated by one witness, immediately after they were declared to be a fire hazard. It is improbable that the destruction of juvenile files of this defendant give any advantage whatsoever to the prosecution. It also appears that the lawful [Nevada] authorities controlling the records of defendant's juvenile commitment at Spring Mountain, by habit and custom, have modified the bare written law in that the out-of-state [Nevada] authorities properly construed the language authorizing sealing of transcripts at age 24 to also authorize destruction of such records to maintain confidentiality permanently. This court, therefore, construes the law involving the defendant's juvenile records as follows: The framers of the [Nevada] statute never contemplated that a defendant would, some 20 years in the future, do a capital murder in another state and did not intend that their records should be maintained by the—for the defendant's benefit so that he might, 20 years later, have access to such mitigating evidence. Through custom and practice the [Nevada] authorities could have, would have, in fact, did lawfully destroy all the defendant's records presumably near age of 24. Therefore, whatever records were destroyed earlier, are totally irrelevant to the issue of sanctions nor are they

material. This court now rules there shall be no dismissal of the penalty phase proceedings, nor is the defendant entitled to any other sanction."

We agree with the trial court's disposition of this issue for one simple reason. Regardless of whether the destruction by the Nevada authorities was proper under that state's law, at the time those records were destroyed, which was approximately 20 years before defendant's trial in this action, neither the records themselves nor their destruction had any cognizable nexus whatsoever with the present case. ▉▉▉ As explained above in connection with another of defendant's claims (see *ante*, p. 976), the federal constitutional guarantee of due process imposes a duty on the state to preserve only such ". . . evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, see *United States* v. *Agurs* [(1976)] 427 U.S. [97], at 109-110 [49 L.Ed.2d 342, 353-354, 96 S.Ct. 2392], evidence must . . . possess an exculpatory value that was apparent before the evidence was destroyed . . . ." (*Trombetta, supra,* 467 U.S. 479, 488-489 [81 L.Ed.2d 413, 422], fn. omitted; *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1233 [255 Cal.Rptr. 569, 767 P.2d 1047].) "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Arizona* v. *Youngblood, supra,* 488 U.S. 51, 58 [102 L.Ed.2d 281, 289].) "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (*Id.,* at p. 57, fn. * [102 L.Ed.2d at p. 288].) ▉▉▉ Applying these principles to the juvenile records in question, we find no constitutionally improper conduct. As suggested by the trial court, when the records were destroyed, the Nevada officials could not reasonably have been expected to foresee the records might contain some mitigating evidence 20 years later.

### 8. *Trial Court's Reading of Probation Report Before Sentencing*

▉▉▉ On December 16, 1988, the trial court was scheduled to hear several post-trial motions, including the automatic application under Penal Code section 190.4, subdivision (e) for modification of verdict. The court stated, "[The] court has received, read and considered the Probation and Sentencing Report and various letters as well as a commitment of death submitted by the People." Defendant contends this was prejudicial error. Defendant is correct that "the preferable procedure is to defer reading the probation report until after ruling on the automatic application for modification of verdict." (*People* v. *Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892]; *People* v. *Hill* (1992) 3 Cal.4th 959, 1012 [13

Cal.Rptr.2d 475, 839 P.2d 984].) " 'In making that ruling the judge is limited to consideration of the evidence that was before the penalty jury.' (*People* v. *Visciotti* [(1992)] 2 Cal.4th 1, 78 [5 Cal.Rptr.2d 495, 825 P.2d 388].) The probation report, of course, was not admitted into evidence." (*People* v. *Hill*, *supra*, 3 Cal.4th at p. 1013.)

We nevertheless reject defendant's contention of error. "Absent a contrary indication in the record, we assume the trial court was not influenced by the report in ruling on the application." (*People* v. *Hill*, *supra*, 3 Cal.4th at p. 1013.) The record in this case shows the trial court relied only on the evidence, not the probation report or letters. Moreover, the court carefully reviewed the evidence, including the aggravating and mitigating circumstances and concluded, "Considering all of the evidence, the court's personal assessment is that the factors in aggravation, beyond all reasonable doubt, overwhelmingly outweigh those in mitigation." On these facts, we hold, "There was no error, and certainly no prejudice." (*People* v. *Livaditis* (1992) 2 Cal.4th 759, 787 [9 Cal.Rptr.2d 72, 831 P.2d 297]; *People* v. *Hill*, *supra*, 3 Cal.4th 959, 1013.)

### Issues Relating to Alleged Organic Brain Damage

#### 1. Factual Background of Brain Damage Allegation

The background of the dispute regarding alleged brain damage is as follows: The jury returned its penalty verdict on July 12, 1988. Sentencing was scheduled for September 2, 1988. Defendant's counsel obtained a continuance of that hearing until November 4, 1988. On that date counsel requested another continuance, explaining they were heavily involved in another case. Counsel also stated:

"Also there is a matter which Mr. Beeler has brought to my attention[.] He only last week learned the significance or possible significance in his case of a head injury he received, subsequent symptoms that apparently he was treated for both in prison and locally. I think we should investigate that.

"The Court: He didn't know he had a head·injury when he had a head injury?

"Mr. Standifer: He apparently was unconscious after it so he didn't know all about it, but he did not know the significance of it and did not report it to us.

"The Court: Certainly seems to be something addressed in the motion for new trial.

"Mr. Standifer: That's exactly right.

"The Court: Sure.

"Mr. Standifer: And [the] point of that is that I—we didn't know about it, Mr. Beeler didn't tell us about it because he only recently learned that it might be significant."

The court granted the request for a continuance until December 16, 1988. On that date, the court held an in camera hearing. Counsel stated they had investigated defendant's prior report of a few isolated blackouts, but that defendant had just told them earlier that day he had begun suffering frequent blackouts. Defendant raised an issue of ineffective assistance of counsel and "wished to have another lawyer appointed because he had not received an EKG [sic, EEG (electroencephalogram)] and a CAT scan [computerized axial tomography]." Counsel explained that "[a]lthough we had doctors address issues based on the information we had, it was our judgment to this point that those tests were not required. Counsel explained that defendant wanted the court to relieve his counsel or to appoint an additional attorney. Defendant stated that he wanted to be tested with a "CAT Scan and EEG because I feel there is something wrong." The court denied the motion to relieve counsel but continued sentencing again, until January 27, 1989, so that counsel could further investigate the possibility of organic brain damage.

On January 27, 1989, the court granted defense counsel's request for another continuance of approximately 60 days, until March 24, 1989, to proceed with defendant's brain testing.

On March 24, 1989, defense counsel requested yet another continuance. Counsel represented that defendant had been given a PET scan (positron emission tomography) and that counsel had received only two days before this hearing ". . . a report from a physician indicating that Mr. Beeler may have organic brain damage and I'm asking that the motion for new trial and sentencing be continued to May 5." Counsel presented no evidence to substantiate his claim. Rather, he explained only that "He [the doctor] has given me a report, an oral report, and some documents which indicate his conclusions regarding brain damage and I need to have him finalize those conclusions and results and I need to have those results analyzed by a forensic neurologist, and I believe that that amount of time is necessary to complete these tasks." The prosecutor objected, but the court concluded, "I think if I simply order they go forward with the motion for new trial and sentencing it would be an abuse of the court's discretion at this time even

though it's taken us as long as it has. So over the objection of the People, the court grants the continuance. I'm hoping it's a hard and fast date for sentencing. . . . [¶] I'm going to suggest that the prosecutor notify the victims that we will probably go on the 5th [of May]. In other words, I allow the continuance to this date with the expectation that we will go forward that day. So let's not come to the courtroom again with the courtroom filled with victims and ask for a continuance again."

Despite the court's warning and the passing of almost 10 months since the verdict (including 8 months of continuances), defense counsel at the May 5, 1989, hearing requested still another continuance, this time on the ground that more time was needed for a defense expert to evaluate defendant's neurological condition. One of defendant's counsel submitted his own declaration setting forth his efforts to obtain an analysis of various tests that had been done and stated that some doctors had told him of problems with defendant's brain. Counsel, however, presented no testimony of any expert even suggesting a neurological problem. The court denied this request for another continuance, and proceeded to deny the motion for new trial and the application to modify the verdict and imposed the death sentence. Defendant contends the trial court erred by denying: (1) the request for a sixth continuance, (2) the motion for new trial, and (3) the application to modify the verdict. We shall address each contention, setting forth additional facts as necessary.

### 2. *Denial of a Further Continuance*

■■■ "Continuances shall be granted only upon a showing of good cause." (Pen. Code, § 1050, subd. (e).) "The granting or denial of a continuance during trial traditionally rests within the sound discretion of the trial judge." (*People* v. *Howard* (1992) 1 Cal.4th 1132, 1171 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) "The burden is on [the defendant] to establish an abuse of judicial discretion . . . ." (*People* v. *Rhines* (1982) 131 Cal.App.3d 498, 506 [182 Cal.Rptr. 478].) "[A]n order of denial is seldom successfully attacked." (5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Trial, § 2502, p. 3002.) We conclude the trial court did not abuse its discretion in denying defendant's May 5, 1989, request for a further continuance.

An important factor for a trial court to consider is whether a continuance would be useful. (*Owens* v. *Superior Court* (1980) 28 Cal.3d 238, 251 [168 Cal.Rptr. 466, 617 P.2d 1098].) Defendant acknowledges that to demonstrate the usefulness of a continuance a party must show both the materiality of the evidence necessitating the continuance and that such evidence could be obtained within a reasonable time. ■■■ In this case, defendant's counsel failed to show either element on the record as of May 5, 1989.

First, counsel's declaration was all the court had before it, and that declaration was most equivocal. It repeatedly stated that the so-called newly discovered evidence *"appears* relevant" and *"suggests"* problems with defendant's mental state. (Italics added.) Moreover, counsel seemed to assume that proof of some type of organic brain damage would be relevant to a material issue. Counsel's declaration permitted only speculation in that regard. Indeed, counsel never even provided any indication regarding whether the alleged damage was sustained before, during, or after the trial. Second, there was no adequate showing the evidence, even if material, could be obtained within a reasonable time. The lengthy delays and prior continuances permit serious doubt whether the additional time requested would have yielded meaningful evidence. The declaration also offered no assurance the requested continuance would be sufficient, stating only that ". . . this doctor *believes* that he can conclude the medical work needed by early August of this year." (Italics added.) In denying the continuance, the court noted in its final remarks, that "I have simply made conclusions from your failure to present anything to the court. . . ." We agree that counsel failed to establish on the record that a further continuance would have been useful. We therefore hold that defendant has failed to show the trial court abused its discretion when it denied his May 5, 1989, request for a further continuance to continue to explore the possibility that he *might* have brain damage that *might* be relevant.

### 3. *Motion for New Trial*

 Defendant contends the trial court should have granted his motion for a new trial based on the allegedly newly discovered evidence of severe organic brain damage. "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' " (*People* v. *Delgado* (1993) 5 Cal.4th 312, 328 [19 Cal.Rptr.2d 529, 851 P.2d 811].) "[U]nless a clear abuse of discretion is shown, a denial of the motion will not be interfered with on appeal." (*People* v. *McDaniel* (1976) 16 Cal.3d 156, 178-179 [127 Cal.Rptr. 467, 545 P.2d 843].

 We find no abuse of discretion because defendant failed to show that a different result would be probable on retrial. The motion for new trial, including the issue of a probable different outcome on retrial, must, of course, be decided on the evidence actually before the court at that time, not on the basis of evidence that might be developed. As explained above, all the

court had before it was counsel's extremely vague and equivocal declaration regarding the alleged results of the brain testing. It was so tenuous that it clearly did not make a different outcome probable, or even remotely likely. This was plainly insufficient to warrant a new trial. An affidavit that is "so vague and general" supports the denial of a motion for new trial. (*People* v. *Kloss* (1897) 115 Cal. 567, 576 [47 P. 459] [affirming denial of new trial in a murder case].)

Counsel's declaration did not even comport with the statutory requirement for a new trial motion. Penal Code section 1181, subdivision 8 states, ". . . When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, *the affidavits of the witnesses by whom such evidence is expected to be given*, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as, under all the circumstances of the case, may seem reasonable." (Italics added.) Defendant did not produce a single affidavit by any witness who could have presented credible evidence of his alleged organic brain damage, submitting instead only the declaration of counsel. "It is to be noted that the alleged motion for a new trial, which was made on the ground of newly discovered evidence, was not supported by an affidavit of a witness by whom newly discovered evidence was to be given. (See Pen. Code, § 1181.) The affidavit was made by the attorney for defendant. It thus appears that there was not a sufficient legal basis for a new trial on the ground of newly discovered evidence, and the court would have been justified in denying the motion." (*People* v. *Ethridge* (1962) 204 Cal.App.2d 279, 282-283 [22 Cal.Rptr. 57]; *People* v. *Fice* (1893) 97 Cal. 459, 460 [32 P. 531] [no affidavit by the proper witness].) Likewise here, counsel's declaration was insufficient under Penal Code section 1181. It was also insufficient to show a probable different outcome on retrial.

We conclude the trial court did not abuse its discretion in denying the motion for a new trial based on the allegedly newly discovered evidence of brain damage.

### 4. *Consideration of Neurological Evidence on Modification Motion*

Defendant contends the trial court erred in taking any action on his automatic application under Penal Code section 190.4, subdivision (e), for modification of the penalty verdict. He reasons as follows: "Where relevant mitigation evidence not heard by the jury is made available to the trial court, the trial court cannot perform the procedural check intended by the section 190.4 motion without either (1) improperly ignoring relevant mitigating

evidence; or (2) improperly considering evidence not presented to the jury. Either choice is error." In other words, as defendant would have it, the trial court could neither grant nor deny the application. The argument has no merit. To be sure, in ruling on the application, the trial court shall not consider evidence not presented to the jury. (Pen. Code, § 190.4, subd. (e); *People* v. *Lewis, supra,* 50 Cal.3d 262, 287.) Not true, however, is defendant's correlative premise that the trial court had to consider the "evidence." He relies on *People* v. *Robertson* (1989) 48 Cal.3d 18, 53-55 [255 Cal.Rptr. 631, 767 P.2d 1109], for the proposition that, in ruling on the automatic application for modification, the trial court should not exclude relevant mitigating evidence from consideration. *Robertson,* however, dealt only with evidence that had been presented to the jury. In the present case, no evidence of the alleged brain damage was presented to the jury. There was no evidence in that regard for the court to consider. Under defendant's strained and novel view, any material brought to the court's attention after trial— even if, as in this case, it is nothing more than a vague and speculative declaration of counsel—would be "evidence" that would preclude a trial court from ruling one way or the other on an automatic application under section 190.4, subdivision (e). There is no authority in precedent or logic for that view. We reject it.

### 5. *Effect of Alleged Brain Damage on Special Circumstance Finding*

Defendant contends the evidence of his alleged brain damage undermines the special circumstance finding that he had a specific intent to kill. (This case is subject to the now-abandoned requirement of a specific intent.) As we have explained in connection with defendant's other claims based on the alleged brain damage, there was no evidence at trial of such damage. To the extent he relies on the post-trial declaration of his counsel, we reject the claim as well. The contention this post-trial information casts doubt on the special circumstance is, in effect, just a different way of arguing that defendant's motion for new trial should have been granted. We have rejected that contention, explaining that counsel's declaration is exceedingly vague and general. Without deciding whether it even rises to the level of being admissible evidence of brain damage, we can confidently conclude that the declaration does not in any way undermine the jury's finding of defendant's specific intent. At best, the declaration suggests that a doctor *might* be able to conclude that defendant *might* have brain damage that *might* have affected his ability to form a specific intent to kill. This is not close to being sufficient to raise any doubt.

### 6. *Ineffective Assistance of Counsel*

▉▉▉▉ Defendant contends his constitutional right to effective counsel was violated by his counsel's failure to investigate sooner his neurological

condition. More specifically, he contends counsel were inadequate in two respects. He first contends they "were ineffective for failing to investigate Beeler's neurological health during trial." He also asserts that, "once trial counsel learned that Beeler suffered from a severe neurological impairment, counsel was ineffective in failing to present expert evidence of this impairment to the court on May 5, 1989," when it denied his request for a further continuance and his motion for new trial. ■■■ "To establish entitlement to relief for ineffective assistance of counsel the burden is on the defendant to show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings." (*People* v. *Lewis*, *supra*, 50 Cal.3d 262, 288.)

### A. Investigation during trial

■■■ Defendant contends the record ". . . is replete with references demonstrating that counsel had sufficient indications of brain damage to warrant an investigation [of his neurological health] at least by the time of Beeler's penalty phase trial." Defendant points to the testimony of two of defendant's penalty phase witnesses that he claims should have triggered this inquiry. We are not persuaded.

Dr. Lenore Walker, a forensic psychologist, testified defendant suffered from disassociation, i.e., events of memory loss or unawareness of what he was doing. Dr. Stephen Wells, another psychologist, also testified ". . . there appears to be a very much an element of what is called dissociation [*sic*] involving memory consciousness, a person is—person's awareness of what he is doing." The psychologists did not testify that they suspected any organic brain damage. Nothing in the record supports a conclusion that evidence of memory loss and disassociation should have alerted counsel to a need for neurological testing for organic brain damage. Nor did defendant's own psychologists testify that such testing was needed.

Dr. Walker also testified that, when defendant was a child he was subjected to terrible physical, emotional, and sexual abuse by his stepmother. A childhood neighbor testified likewise, recounting among other things an incident in which defendant was pushed down a flight of stairs. Defendant points to his "long history of mental health problems" and contends this history should have triggered some investigation into a possible neurological link to those problems. Again, nothing in the record supports the conclusion that defendant's terrible childhood and prior diagnoses supported an inference of organic brain damage that would warrant neurological testing.

In short, the record does not support defendant's contention that the evidence at trial should have caused his counsel to seek neurological testing.

### B. *Investigation after trial*

Defendant also challenges counsel's performance after the penalty verdict was returned, asserting their ". . . lack of diligence in procuring an expert witness to enlighten the court about his organic brain damage." This contention assumes as its premise that defendant *in fact* does suffer from organic brain damage. The record on appeal does not support that inference. As we have explained in detail above in connection with other contentions based on the alleged brain damage (*ante,* at pp. 1003-1005), the record contains not a single declaration by any competent expert that defendant has any brain damage of any kind. The only information in that regard is his counsel's declaration seeking a sixth continuance. Whether counsel could offer competent testimony regarding brain damage is most doubtful. (Evid. Code, § 720.) But, even if we assume, solely for discussion, that counsel's declaration could be considered as being evidence, the declaration itself was tenuous hearsay at best. The record does not establish that defendant suffers from organic brain damage. We therefore cannot conclude that counsel were ineffective for not ". . . procuring an expert witness to enlighten the court about his [defendant's] organic brain damage." Because the record does not establish that defendant in fact suffers from organic brain damage, the question of whether his counsel should have obtained an expert's opinion about that brain damage is a question that must be raised, if at all, in a petition for writ of habeas corpus. We cannot on appeal conclude that counsel should have obtained expert opinion regarding a "fact" that is not demonstrated in the record to be a fact.

Perhaps defendant means to contend counsel became aware of defendant's brain damage when they learned of defendant's alleged blackouts and thus should have obtained expert opinion regarding the brain damage. Again, this view assumes too much. The occurrence of the blackouts—even if true—does not establish brain damage. Likewise, counsel's knowledge of the blackouts did not mean that counsel knew of brain damage.

Viewed most favorably to defendant, his argument may be construed as follows: when they learned of defendant's blackouts, counsel should more promptly have obtained expert opinion regarding whether the blackouts were caused by organic brain damage. Even in this light, however, the argument fails. First, it begins with the assumption that a defendant's claim of blackouts necessarily imposes on counsel, and the trial court as well, a duty to obtain sophisticated neurological testing to determine whether the defendant

has brain damage. This record is insufficient to support such a broad and inflexible rule. One can easily foresee its consequences. Merely by claiming after trial a blackout or series of them, a defendant would be entitled to brain testing that might, as in this case, take months to complete. Delay is not the only concern. Such testing might not establish any brain damage, and even if some damage were proven, whether it would be of any legal consequence is entirely speculative at best. Second, defendant's view is also factually flawed because it assumes that a person's blackouts, without more, necessarily create a medical need for neurological testing. Defendant fails, however, to establish on the record any such medical protocol.

We acknowledge, however, that, perhaps in an abundance of caution, the trial court in this case authorized neurological testing, and counsel undertook to obtain that testing. Defendant assumes that, once the task was undertaken, counsel had a duty to diligently pursue the matter. Only for the purpose of discussion and without stating any broad rule, we will accept that assumption as being correct. We cannot conclude from this record, however, that counsel were not diligent. Doing so would require us to speculate in detail as to the circumstances faced by counsel and their actions. We decline to so speculate.

For the same reason, defendant fails to establish any prejudice from counsel's alleged failures, whether during or after trial. The faulty premise of defendant's argument is also its faulty conclusion. His premise is that he suffers severe brain damage, and his conclusion is that he was prejudiced because the jury was not told of the brain damage. This argument must fail on appeal because defendant has failed to establish brain damage on the record. At best, all we know from the record is *his counsel's* characterization of what the brain testing *might* show. That is not a sufficient basis on which we can conclude that "it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings." (*People* v. *Lewis, supra,* 50 Cal.3d at p. 288.) To the contrary, we cannot make an informed decision regarding what effect, if any, the alleged brain-damage evidence might have had on the jury because we do not know what that evidence would show, indeed, whether it would show any brain damage.

The only "evidence" of brain damage in the appellate record is counsel's declaration. We doubt defendant means to suggest that the jury's verdict would have been different if they had been provided with counsel's declaration. If, however, that is his contention, we reject it. It seems obvious that a jury would be most skeptical of counsel's lay statements regarding his client's neurological condition. Such information would not be from an unbiased source. Nor would it be from a knowledgeable source. Indeed,

whether counsel would even be competent to testify is doubtful. (Evid. Code, § 720.)

Moreover, apart from the fact that the information was from counsel, we cannot conclude the substance of the information contained in counsel's declaration would have made a more favorable result reasonably probable. As we have already explained, the record does not sufficiently establish that defendant suffers from any neurological malady, much less one that might have affected the verdict. We are asked to speculate how a jury might have reacted to highly speculative evidence—if it was evidence—of possible brain damage. We decline to engage in such double speculation.

In summary, we cannot conclude on appeal that defendant was denied effective assistance of counsel. The question of whether there was ineffective assistance of counsel is properly left to a habeas corpus proceeding.

### DISPOSITION

The judgment is affirmed in its entirety.

**MOSK, J., Concurring and Dissenting.**—I concur in the judgment as to guilt, death eligibility, and noncapital sentence. After review, I have found no reversible error or other defect.

I dissent, however, from the judgment as to the sentence of death.

I agree with Justice Kennard that, by handling the matter relating to Juror Coley as it did, the superior court committed prejudicial error under the United States Constitution. I join in her persuasive analysis.

I write separately to express my view that reversal is required without regard to the federal charter.

The superior court committed error under California law. Such a conclusion is implicit in Justice Kennard's discussion.

This error is reversible in and of itself. I do not overlook section 13 of article VI of the California Constitution: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a

miscarriage of justice." Article VI, section 13, however, was effectively abrogated in *In re Carpenter* (1995) 9 Cal.4th 634 [38 Cal.Rptr.2d 665, 889 P.2d 985]. There, a bare majority of this court reversed a judgment without expressing any opinion whether a "miscarriage of justice" had resulted and indeed without even examining the "entire cause, including the evidence." I follow that precedent here.

For the foregoing reasons, I would reverse the judgment of death.

**KENNARD, J.,** Concurring and Dissenting.—I concur in the majority's affirmance of the judgment as to guilt and the special circumstance but not as to the penalty of death.

The father of Juror Michael Coley, one of the jurors in this case, died during the jury's deliberations over whether defendant Beeler should receive the death penalty. The trial court then met ex parte with Juror Coley and, without inquiring into his emotional condition or giving any admonition to guard against a rushed or poorly considered verdict, directed Juror Coley to resume deliberations immediately after the death of his father under a one-hour deadline. The majority holds that the trial court did not err and that the verdict of death returned by the jury under these circumstances is sound.

Justice Baxter and I both agree that the trial court erred. Unlike Justice Baxter, however, I am of the view that we must conclude on this record that the error was prejudicial. Therefore, I would not leave this issue for resolution on habeas corpus, but would resolve it on appeal and reverse the judgment as to the penalty of death.

I

On a Tuesday morning, the start of the third day of the jury's penalty phase deliberations, Juror Coley informed the court clerk that his father, with whom he had a "close relationship," had just died and that he needed to leave the state that afternoon on a 2 p.m. flight to attend his father's funeral. The court met briefly with Juror Coley around 10 a.m. Defendant was not present, nor was his counsel or the prosecutor. Both attorneys were together at another courthouse and had telephoned the court at 9 a.m., at which time the bailiff told them of Juror Coley's situation but not of the court's plans to talk to Juror Coley. When both attorneys again called the court at 9:40 a.m., the bailiff informed them that Juror Coley would be coming to court at 10 a.m. Counsel proceeded directly to court and arrived at 10:20 a.m., after the court had concluded its ex parte meeting with Juror Coley.

In its ex parte meeting with Juror Coley, the trial court first discussed the matter with Juror Coley off the record. The court then summarized their

discussion on the record. Without inquiring into Juror Coley's emotional state or giving him or the other jurors any admonitions, the court instructed him to resume deliberations with the jury for approximately an hour, at which time the jury would adjourn until the following Monday, six days later.

Deliberations resumed. When counsel and defendant arrived, the defense objected to continuing deliberations and moved to replace Juror Coley with an alternate juror. The trial court denied the request. A short time later, less than an hour after it had resumed deliberations, the jury announced it had reached a verdict. The trial court inquired of the jury panel whether the verdict had been affected by the death of Juror Coley's father or by the deadline posed by Juror Coley's imminent departure. The jury foreperson answered "no" to both questions; no other juror responded. The jury returned a verdict of death.

## II

The majority analyzes the trial court's conduct in directing the jury to continue deliberations in the manner it did after the death of Juror Coley's father solely in terms of Penal Code section 1089, which provides that if a juror "upon . . . good cause shown to the court is found to be unable to perform his duty, or . . . requests a discharge and good cause appears therefor, the court may order him to be discharged . . . ." More fundamental constitutional rights, however, are also implicated by the trial court's course of action.

"Due process means a jury capable and willing to decide the case *solely* on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." (*Smith* v. *Phillips* (1982) 455 U.S. 209, 217 [71 L.Ed.2d 78, 86, 102 S.Ct. 940], italics added.) At the penalty phase as well as the guilt phase of a capital trial, the jury "must stand impartial and indifferent"; its " 'verdict must be based upon the evidence developed at the trial,' " and may not be influenced by any other external consideration. (*Morgan* v. *Illinois* (1992) 504 U.S. 719, 726-728 [119 L.Ed.2d 492, 501-502, 112 S.Ct. 2222, 2228-2229].) Indeed, at the penalty phase there is a "heightened 'need for reliability in the determination that death is the appropriate punishment' " (*Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 340 [86 L.Ed.2d 231, 246, 105 S.Ct. 2633]), and for "the responsible and reliable exercise of sentencing discretion" (*id.* at p. 329 [86 L.Ed.2d at p. 239]).

Here, the events surrounding the death of Juror Coley's father were potentially "prejudicial occurrences." (*Smith* v. *Phillips, supra,* 455 U.S. 209,

217 [71 L.Ed.2d 78, 86].) The trial court's response, however, formulated without the presence or knowledge of defendant and his counsel, aggravated unacceptably the risk that the jury would not decide the case "solely on the evidence before it" (*ibid.*) in a manner satisfying the "heightened 'need for reliability' " (*Caldwell* v. *Mississippi, supra,* 472 U.S. 320, 340 [86 L.Ed.2d 231, 246]) in capital sentencing.

The trial court's error here was not the mere fact, without more, that a juror continued to sit after the death of an immediate family member. Rather, the error has three aspects: (1) The trial court's requirement that Juror Coley immediately resume deliberations on the morning of his father's death without inquiring into or making a record of Juror Coley's emotional condition and without giving him or the other jurors any admonition not to rush their deliberations. (2) The court's requirement that the jury resume deliberations for an hour under the condition that if it did not reach a verdict within that brief time it would have to return six days later. This schedule created a great risk that Juror Coley and the other jurors, unconsciously or otherwise, would hasten their deliberations and suppress any uncertainties or disagreements to reach a verdict within an hour so that Juror Coley could be on his way and so that they would not have to return a week later to resume deliberations. (3) The court's action in reaching these decisions by an ex parte and partially unrecorded proceeding with Juror Coley, thereby denying defendant and his counsel an opportunity to participate, and the court's refusal to reconsider the course it had adopted once defendant and his counsel did appear and object.

Although not every juror who suffers a death in the family will need to be discharged, the trial court's mode of proceeding here failed to ensure that Juror Coley and the other jurors would return an unhurried verdict that was the product of composed and deliberate reflection. As the concurring and dissenting opinion by Justice Baxter aptly observes, courts have long recognized the human reality that the death of an immediate family member can have a profound effect on jurors and can disrupt the calm, dispassionate, and focused deliberation they must bring to bear on their sworn task of deciding guilt or, as here, whether a defendant should be put to death. Accordingly, in this case there was a great risk that the emotional trauma of the death of his father would cloud Juror Coley's deliberations, as well as a risk that it would also distract the other jurors.

The trial court, however, did not inquire into Juror Coley's emotional condition. It did not ask him whether he was distressed or whether he felt capable of resuming deliberations immediately. It did not give Juror Coley or the other jurors any admonitions to ensure that deliberations continued in a calm, unhurried manner.

Instead, the trial court exacerbated the potential for prejudice by directing Juror Coley to resume deliberations with the other jurors under the pressure of returning a verdict within an hour to avoid having to return a week later. That deadline created a strong incentive for the jurors to reach a verdict within that brief period, however much they might attempt to put that incentive out of their minds and deliberate fully and conscientiously. The jurors should not have been placed in that compromising position. (See *People* v. *Hutchinson* (1969) 71 Cal.2d 342, 346, 351 [78 Cal.Rptr. 196, 455 P.2d 132] [bailiff's remarks at the end of a day of deliberations that if jury did not reach verdict in a few minutes it would be locked up overnight were " 'likely to have influenced the verdict improperly' "]; *People* v. *Carter* (1968) 68 Cal.2d 810, 817 [69 Cal.Rptr. 297, 442 P.2d 353] [conviction reversed; jury returned verdict 10 minutes after being told that if there was no verdict within a half-hour the jury would be locked up for the night; court looked to whether "the independent judgment of the jury [was displaced] in favor of considerations of compromise and expediency"]; *People* v. *Crowley* (1950) 101 Cal.App.2d 71, 78-79 [224 P.2d 748] [conviction reversed; jury, upon being told at 4:30 p.m. that if no verdict was reached by 5 p.m. the jury would be locked up for the night, returned a verdict at 5 p.m.].)

Finally, the trial court acted without the participation or presence of counsel or defendant. This ex parte proceeding further contributed to the error, for had counsel and defendant been present when the court spoke to Juror Coley, there doubtless would have been inquiry into Juror Coley's emotional condition and objection to resuming deliberations for the brief period before Juror Coley had to depart. Defense counsel did raise these objections immediately upon being informed of what the trial court had done, before the jury returned its verdict.

"[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." (*Kentucky* v. *Stincer* (1987) 482 U.S. 730, 745 [96 L.Ed.2d 631, 647, 107 S.Ct. 2658].) In particular, due process and the right to counsel give the defendant the right to be present with counsel at communications of substance between the court and a juror. (*People* v. *Wright* (1990) 52 Cal.3d 367, 402 [276 Cal.Rptr. 731, 802 P.2d 221].) " 'This rule [against ex parte communications] is based on the precept that a defendant should be afforded an adequate opportunity to evaluate the propriety of a proposed judicial response in order to pose an objection or suggest a different reply more favorable to the defendant's case.' [Citations.]" (*Ibid.*)

Here, had defendant and his counsel been present, they would have contributed to ensuring the fairness of the jury's deliberations by probing

whether Juror Coley was emotionally capable of deliberating in the manner required by the California and federal Constitutions and by making certain that the jury was not subject to the external pressure of a deadline. This is shown by the questions and objections the defense did pose once counsel and defendant arrived in court. Thus, the trial court's ex parte proceeding was error.

Because "such [ex parte] communications . . . constitute federal constitutional error," reversal is required unless the prosecution can establish from the record that the error is "harmless beyond a reasonable doubt." (*People* v. *Wright, supra,* 52 Cal.3d at p. 403; see also *People* v. *Whitt* (1990) 51 Cal.3d 620, 671 [274 Cal.Rptr. 252, 798 P.2d 849] (conc. & dis. opn. of Kennard, J.).) The prosecution has not carried its burden of showing the error harmless beyond a reasonable doubt on the record before us.[1]

Nor can the trial court's decision to proceed ex parte be excused, as the majority attempts to do, on the ground that it was merely a brief, routine administrative communication. Juror Coley was not asking where he could get a cup of coffee or how to get reimbursed for mileage. He was informing the court of an emotionally disturbing event that had just occurred and of his need to leave the state immediately. In acting as it did, the trial court made an ex parte decision, without the participation of the defense, as to whether Juror Coley was capable of continuing deliberations and whether deliberations should resume under the deadline presented by Juror Coley's impending departure. These are not mere administrative decisions.

### III

The majority misguidedly attempts to support its conclusion that no error occurred by relying on the record's silences as to Juror Coley's emotional

---

[1]The two cases relied on by the majority, *People* v. *Ashmus* (1991) 54 Cal.3d 932, 986-987 [2 Cal.Rptr.2d 112, 820 P.2d 214] and *In re Mendes* (1979) 23 Cal.3d 847, 852 [153 Cal.Rptr. 831, 592 P.2d 318], for its conclusion that the trial court did not err in acting ex parte are not to the contrary. Both cases involved the trial court's discharge without a hearing of a juror after a death in the juror's immediate family. The ex parte *discharge* of a possibly impaired juror as occurred in *Ashmus* and *Mendes*, whether or not in compliance with Penal Code section 1089 and whether or not the juror is actually impaired, moots any constitutional question because it removes any possibility that an impaired juror would sit in judgment in the case. Any error in proceeding to discharge the juror in the absence of counsel and the defendant could not harm the defendant's right to an impartial jury, nor could the presence of the defendant and his counsel have further increased the impartiality of the jury, since the possibly impaired juror was no longer on the panel. By contrast, the ex parte decision in this case to *retain* a possibly impaired juror (not to mention the further ex parte decision to have the jury deliberate under deadline) was not similarly harmless. It risked denying defendant his right to an impartial jury; furthermore, the presence of defendant and his counsel would have reduced the risk of that erroneous and unfair outcome occurring.

state and the effect of the trial court's deadline on the jury's deliberations. Initially, it is important to recall that the trial court did not record its entire conversation with Juror Coley but only recited a summary of the information the court had received from Juror Coley. The majority holds that defendant's claim fails because this partial record does not show a request by Juror Coley to be discharged, does not show a request by Juror Coley that he not be required to deliberate on the day of his father's death, and does not show that any other juror was affected by the circumstances.

These gaps in the record, however, are not chargeable to defendant. A significant part of the trial court's error was its failure to permit defendant to make a full record of the relevant circumstances or to make such a record itself. In doing so the court did not only deny defendant the opportunity to make a *contemporaneous* record (important when attempting to inquire into subjective and transient mental conditions like a juror's emotional state after a death in the family). It also denied defendant *forever* the opportunity to make a record of the effect of the death of Juror Coley's father and the trial court's deadline on the deliberations and mental processes of Juror Coley and the other jurors, because under Evidence Code section 1150 such matters may only be inquired into before the verdict is reached.[2] Evidence Code section 1150 prohibits jurors from testifying as to "the effect of [any] statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Evid. Code, § 1150, subd. (a); see also *People* v. *Hutchinson, supra,* 71 Cal.2d at p. 350 ["The only improper influences that may be proved under section 1150 . . . are those open to sight, hearing, and the other senses and thus subject to corroboration."].) Evidence Code section 1150 codifies the long-standing rule that a juror " 'may testify to any facts bearing upon the question of the existence of the disturbing influence, but he cannot be permitted to testify how far that influence operated upon his

---

[2]Accordingly, the trial court's *postverdict* inquiry of the jurors was improper and cannot be used to support the conclusion that no error occurred. The court's questions to the jury asked about the influence of the death of Juror Coley's father and of Juror Coley's imminent departure on the mental processes of the jurors in arriving at their verdict of death. By its inquiry, the court sought answers that Evidence Code section 1150 prohibits, i.e., "the effect of [any] statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Evid. Code, § 1150, subd. (a); see also *People* v. *Hutchinson, supra,* 71 Cal.2d at pp. 349-350.)

Moreover, even if it were admissible, the trial court's inquiry was cursory and ineffectual, consisting of only two questions to the panel as a whole. Only the jury foreperson answered. The trial court did not ask any questions individually of Juror Coley or any other juror. The manner in which the trial court framed the two questions it asked of the panel as a whole put the burden on any juror who disagreed with the foreperson's response to volunteer that disagreement and disown before the other jurors the verdict they had all just agreed to moments before.

mind.' " (*People* v. *Stokes* (1894) 103 Cal. 193, 197 [37 P. 207].) Although Evidence Code section 1150 prohibits postverdict inquiries into a juror's mental processes, it does not bar preverdict inquiries. "By its very language, this section applies only to postverdict inquiries into how error or misconduct had affected the juror in reaching the verdict. [Citation.] The section does not prohibit individual questioning of jurors [during deliberations] to assure the court there will be no *future* harm, to obviate any such harm, or to strengthen the effectiveness of an admonition." (*People* v. *Cooper* (1991) 53 Cal.3d 771, 838 [281 Cal.Rptr. 90, 809 P.2d 865], original italics.)

The majority's reliance on the record's silences erroneously imposes on defendant the consequences of the trial court's error and the burden of proving it harmless.[3] As the United States Supreme Court has held, violations of fundamental rights cannot be ignored simply because "the precise consequences . . . cannot be shown from a trial transcript." (*Riggins* v. *Nevada* (1992) 504 U.S. 127, 137 [118 L.Ed.2d 479, 491, 112 S.Ct. 1810, 1816].) "The actual impact of a particular practice on the judgment of jurors cannot always be fully determined. But this Court has left no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny. [Citations.] Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience." (*Estelle* v. *Williams* (1976) 425 U.S. 501, 504 [48 L.Ed.2d 126, 130, 96 S.Ct. 1691]; see also *People* v. *Stokes, supra*, 103 Cal. at pp. 198-199 [reversing conviction where an " 'irregularity was shown which may have influenced' " the jury's verdict because "[w]e cannot say that the verdict of guilty is based wholly upon the evidence introduced at trial"].)

Accordingly, the majority's attempt to support its position by resting on a record that the trial court's error has in crucial respects left forever mute must fail. Because reason, principle, and common human experience teach us that a deadline for deliberation and the death of a father are both substantial impediments to calm, dispassionate, focused decisionmaking; because the trial court took no steps to ameliorate the impact of these

---

[3]The majority also ignores the significant practical obstacles with which it has burdened defendant by requiring him at this late date to investigate and make the record that the trial court should have made. Because of the trial court's error, defendant is faced with the difficult task of attempting to locate Juror Coley and the other jurors and persuading them to voluntarily assist a man whom they have sentenced to death in his efforts to overturn the verdict that they agreed to.

impediments; and because nothing in the record shows that these impediments did not have their ordinary and expected effects in this case, I would reverse the penalty phase judgment.[4]

IV

When a juror has suffered a death in the family, the trial court at a minimum should conduct a sensitive inquiry into whether the juror is able to continue deliberations or will be able to do so after a reasonable interval. Appropriate admonitions to the affected juror and to the other members of the panel may help assure that if and when deliberations resume they continue in a calm and dispassionate manner, focused solely on the evidence, and without any rush to judgment. The resumption of deliberations can be scheduled so that the jurors do not deliberate under the pressure of a deadline. The defendant can be afforded an opportunity to participate in the decision as to how best to avoid the substantial risk of prejudice inherent in the situation and to bring out any relevant circumstances that the trial court has not explored.

None of that occurred in this case, however. Accordingly, I would reverse the judgment of death.

**BAXTER, J., Concurring and Dissenting.**—I respectfully disagree with the majority's conclusion that the trial court did not err in its handling of the circumstances that arose on the death of Juror Coley's father. I concur, however, in the majority's judgment affirming defendant's conviction and death sentence because the record on appeal does not provide a basis for determining that the error was prejudicial.

Put simply, the situation was this: Juror Coley's father had died within a few hours before Coley returned to court on Tuesday for the third day of penalty deliberations. Coley told the court he was emotionally close to his father and had to leave early to fly to the funeral. The court told Coley to resume deliberations, which would be recessed in time for Coley to board his flight, and that he must return the following Monday unless there was some

---

[4]Likewise, in *In re Mendes, supra,* 23 Cal.3d 847, 852, one of the cases the majority relies on, there was no evidence in the record as to the emotional state of a juror whose brother had died, but we presumed that "normal grief would make it exceedingly difficult for [the juror] to concentrate on the evidence, the arguments of counsel, the court's instructions and the jury's deliberations." (*Ibid.*) There is no reason not to presume the ordinary effects of "normal grief" operated in this case as well. Nor, contrary to the majority, did the record in *Mendes* contain any request by the juror to be excused. Instead, as here, the record did not contain the full exchange between the court and the juror and showed no request by the juror to be discharged. We only inferred such a request had occurred.

other severe problem that prevented his return at that time. The court did not offer the juror any guidance how to proceed. In particular, he was not admonished to refrain from telling the other jurors of the death, and he was not told that the press of time—either for getting to the airport or returning the following week—must not affect his independent judgment or the deliberations of the other jurors.

This lack of any precaution created a situation rife with the possibility of prejudice. For most people, there are few, if any, situations that are more debilitating and distracting than the hours of grief shortly after the loss of a mother, father, child, or sibling. This conclusion requires no judicial expertise; it is inherent in human experience. Courts have long recognized that a juror who has very recently suffered a death in his or her immediate family is often in an emotional state not suited for jury deliberations, especially when the defendant's very life is at stake. (See Annot., Illness or Death of Member of Juror's Family as Justification for Declaring Mistrial and Discharging Jury in Criminal Case (1928) 53 A.L.R. 1062; 1 Wharton's Criminal Law (14th ed. 1978) § 61, p. 325.) In one of the earliest reported cases, the families of two jurors became ill during a murder trial, and those jurors were excused. The court noted that not every illness in a juror's family would warrant excusal for cause, and that good cause had not been shown in that case because the record did not show the nature or severity of the illnesses or that the jurors needed to be with their families. The court explained, however, what would be good cause if shown. "It certainly requires no argument to show that, if the wife or child of a juror is at the point of death, he would not be in a state of mind to discharge the duties which devolved upon him, with that degree of patience, calmness and deliberation, which was due in the investigation of cases of this magnitude and importance; and *it would unquestionably be the duty of the court to discharge a juror under such circumstances.*" (*Parsons* v. *The State* (1853) 22 Ala. 50, 53, italics added.) Although the observation was obiter dictum, the same court later made clear that serious illness or death in a juror's family was of extreme importance, especially in a capital case. (*Hawes* v. *State* (1890) 88 Ala. 37 [7 So. 302, 311] (*Hawes*).) Indeed, the court rejected the capital *defendant's* contention that a juror whose wife became critically ill should not have been discharged. The court found a manifest necessity for the discharge, pointing to its prior decision in *Parsons, supra,* 22 Ala. 50, and to an intervening decision by another state's high court that the death of a juror's son required the juror's discharge. (*Hawes, supra,* 7 So. at p. 311, citing *State* v. *Davis* (1888) 31 W.Va. 390 [7 S.E. 24] and *Commonwealth* v. *Fells* (1838) 36 Va. (9 Leigh) 613, 618-619 [impending childbirth by juror's wife held to be a necessity for juror's discharge].)

The development of the law on this point was subsequently examined by the Georgia Supreme Court in a capital case in which it rejected the

defendant's plea of double jeopardy based on his claim that in a prior trial a juror should not have been discharged merely because his mother had died. After canvassing earlier cases, the court eloquently explained, "As civilization and refinement have progressed, there has been a growing disposition on the part of the courts to recognize the influence of the feelings and emotions upon the mind, as producing this necessity [for discharge]. . . . [¶] . . . One whose mind is disturbed and distracted by sudden grief is certainly in no condition to discharge the grave and responsible duty of trying another for his life. What judge would be in a fit condition to preside on the trial of a capital case, upon being summoned to the deathbed of his wife, his child, or his mother? And would any court hold that a judge who is informed, while trying a case, that his wife has just died, cannot return to his home, and attend her funeral, but must go on with the trial? No man of ordinary sensibilities, it seems to me, would be in a proper state of mind to discharge his functions as a judge on the trial of a case, under such circumstances, and he should not be compelled to do so. As was said in the case of *State* v. *Tatman* [(1882) 59 Iowa 471 (13 N.W. 632)], 'the law makes no such inhuman requirements.' If what has been said is true as to a judge, it is equally true as to a juror. In order to perform his duty properly, he must give his close and undivided attention to the testimony, as delivered by each witness, and to the law, as given in charge by the court. He must carry both in his mind, and carefully apply the one to the other, and it is often necessary that he should make nice distinctions in the application of the law. It is not to be expected that a juror will perform this duty properly, under the circumstances shown by the record in this case. The question to be considered is, not whether the juror, in view of the greater importance of trying the prisoner than of paying the last tribute of affection and respect to his departed mother, should put aside his grief, and proceed undisturbed in the performance of his duty, but whether, as a matter of fact, he is capable of doing this. If not, the ends of justice require that he be discharged from the jury. What was said by the court in the case of State v. Davis [(1888) 31 W.Va. 390 (7 S.E. 24)] where the juror was discharged on account of the death of his son, will apply equally in the present case: 'Observation teaches us, if, indeed, we have not learned from sad experience, that the natural result of information suddenly imparted to a father, of the death of a child, is to unfit him, for the time, to attend to business. . . . His grief would naturally unfit him for the discharge of such an important [jury] duty. And if, as the court said in Fell's Case [(1838) 36 Va. (9 Leigh) 613], the object of the trial is to obtain a fair, just, and impartial verdict, there is little prospect of it, under such circumstances. This is one of the cases spoken of in the opinion in that case, where a juror is, from the peculiar condition of his mind and feelings, manifestly disqualified from bestowing on the case that attention and impartial consideration which is necessary to a just verdict." (*Stocks* v. *State* (1893) 91 Ga. 831 [18 S.E. 847, 849].)

Other courts have embraced the same principle. "It requires no argument to show that the effect upon the mind of the juror upon receiving information of the death of his mother was to render him incapable of that calm and deliberate consideration and reasoning which is due in the investigation of cases of this importance and magnitude [i.e., murder case]." (*Spelce* v. *State* (1924) 20 Ala.App. 412 [103 So. 694, 698].) In *Salistean* v. *State* (1927) 115 Neb. 838 [215 N.W.107, 53 A.L.R. 105] (*Salistean*), an arson prosecution, a juror's newborn child died and his wife was seriously ill after the birth. He was discharged. The court compassionately observed, "The serious illness of the wife of the juror and the death of his child would, as a matter of common knowledge, have caused him distress of mind and incapacitated him from giving the case any consideration. To have continued with the trial under such conditions would have been inhuman. It would have been equivalent to trying the case to eleven jurors." (*Id.*, at p. 109; *Woodward* v. *State* (1900) 42 Tex. Crim. 188 [58 S.W. 135, 139] [child of juror in murder case became critically ill].)

More recent cases, though not in the vivid language of our learned judicial predecessors and though arising in a variety of contexts, continue to reflect the recognition that a death in a juror's family raises a serious question of his or her ability to deliberate in the death's immediate aftermath. (*Weaver* v. *State* (1969) 45 Ala.App. 243 [228 So.2d 857] [reversing manslaughter conviction on ground that mistrial should have been granted when juror's mother died]; *United States* v. *Smith* (9th Cir. 1980) 621 F.2d 350, 351 [defendant held to have impliedly consented to mistrial when juror's mother had stroke]; *Malota* v. *State* (Fla.Dist.Ct.App. 1976) 336 So.2d 1267, 1268 [affirming judgment rendered after a replacement juror was substituted for juror whose nephew was killed]; *Allen* v. *State* (Tex.Crim.App. 1993) 867 S.W.2d 427, 430 [approving excusal of juror whose aunt and brother-in-law died]; *People* v. *Portalatin* (1980) 105 Misc.2d 725 [433 N.Y.S.2d 57, 58] [approved mistrial declared when juror's father suffered stroke].)

I do not agree with the suggestion in some of the foregoing cases that a family death necessarily *requires* the juror's discharge. In my view that goes too far. I discuss those cases, however, because they reflect a long-standing acknowledgment that a death in a juror's immediate family can have, at least temporarily, a profound effect on a juror's ability to deliberate. Any such diminution of the juror's ability is of the gravest importance when the decision is whether the defendant shall live or die.

This sensitive situation arising from the death of Juror Coley's father was made even more troublesome by the time deadline facing Juror Coley. He

was faced with a situation in which he had an incentive for the jury to return a verdict as soon as possible. His flight was scheduled to depart within hours. (Indeed, the common realities of travel suggest the court allowed him barely enough time, if that, to leave the courthouse, travel to the airport, handle preboarding chores, and board the flight.) The court had told him that, if the jury did not return a verdict before then, he would be recalled the following week, beyond the time the jurors had been told would be necessary for the trial. Moreover, Juror Coley would have had to leave his grieving family after a very short time and, in all likelihood, would still have been upset and unsettled by his father's untimely death. The pressure to decide defendant's fate with undue dispatch was plainly great.

The likely pressure on the other jurors also cannot be discounted. It would be fanciful to believe Juror Coley did not tell them of his father's death, as momentous an occasion as one is likely to bear. Indeed, absent such information, they would have been perplexed as to why deliberations were being truncated that day. In short, they almost certainly knew of the death and the time pressure. As the *Salistean* court, *supra*, 215 N.W. 107, 109, perceptively observed, *"the sympathy of the other jurors would naturally have been with him in his misfortune and tend to render them anxious to dispose of the case as quickly as possible.* Under such circumstances the jury would not give the case the careful consideration which the importance of the issue merited." (Italics added.) Likewise here, in addition to having sympathy for Juror Coley, the other jurors (and Coley himself) were faced with the prospect of having to return several days later if they could not return a penalty verdict within approximately an hour. And, Juror Coley was faced with the prospect of burying his father while wrestling with the weighty issue of whether defendant should live or die. Any normal person would be tempted to shed the latter burden so as to be able better to bear the former. Under these circumstances, I am troubled by the fact that—*within the hour* after the court directed Juror Coley to resume deliberations—the jury returned its death verdict.

We have not previously had the same situation before us, but we have acknowledged the difficulty encountered by a juror who has suffered such a family loss. In *In re Mendes* (1979) 23 Cal.3d 847 [153 Cal.Rptr. 831, 592 P.2d 318] (*Mendes*), the defendant objected to the trial court's having excused without a hearing a juror whose brother had died the previous night. We cautioned that a juror should not be excused without a hearing "[u]nless the facts clearly establish a sufficient basis on which to reach an informed and intelligent decision" that good cause for the excusal is present. (*Id.*, at p. 852.) Even though no hearing had been held and although we knew nothing

of the circumstances, we explained that we had ". . . no difficulty, in the case before us, in concluding that the reason for [juror] Mrs. McQuown's request to be excused clearly constituted 'good cause.' . . . [*N*]*ormal grief would make it exceedingly difficult* for Mrs. McQuown to concentrate on the evidence, the arguments of counsel, the court's instructions and the jury's deliberations. In our view, a hearing would have been pointless and perhaps callous." (*Ibid.*, italics added.) In a later capital case, we upheld the trial court's summary discharge during penalty deliberations of a juror whose mother had died the preceding night. (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 986-987 [2 Cal.Rptr.2d 112, 820 P.2d 214] (*Ashmus*).) We observed that ". . . a mother's death is 'obviously . . . a tragic and disturbing event.' " (*Id.*, at p. 987) I agree with the majority that *Ashmus, supra,* 54 Cal.3d 932, and *Mendes, supra,* 23 Cal.3d 847, are factually distinguishable from the present case because in those cases the jurors had requested to be discharged, whereas the present record does not reflect that Juror Coley made such a request. I believe, though, that the distinction misses the mark. In neither case did this court place any importance on the request itself. Rather, our basic point was that the situation, i.e., a death in the juror's family, is so patently fraught with difficulty that no inquiry of record is necessary to establish that fact. It seems to me the logical converse of this principle is that a hearing is required before allowing the juror to proceed immediately with further deliberations.

The substance of the ex parte communication between the court and Juror Coley did not ameliorate the situation. (I agree with the majority that the mere fact of the communication was not error. Some administrative discretion must be allowed the trial court in dealing with unexpected circumstances.) To the contrary, the communication worsened the problem because the court did nothing to assure that deliberations would be unaffected by Juror Coley's loss. Indeed, the court failed even to inquire on the record whether Juror Coley wished to be discharged from further service. Faced with a circumstance that had an obvious potential for creating problems, especially for Juror Coley's ability to deliberate properly, the trial court should have inquired at a minimum in some detail and *on the record* as to Juror Coley's emotional state and cautioned him not to let his father's death affect his deliberations, specifically not to rush them. The court also should have directed Coley not to inform the other jurors of the problem. By contrast, when Juror McCoskey had emotional problems with the trial and discussed them with the court, the court properly cautioned her that " '. . . because we've talked to you privately that shouldn't affect any of your decisions in any regard . . . .' " (Maj. opn., *ante*, at p. 974.)

I do not suggest that a juror who has suffered a family death cannot under any circumstance be allowed to continue deliberations. Nor do I suggest that

Juror Coley was unable to continue deliberations, even in the immediate aftermath of learning of his father's death. Of course, a trial court has discretion to determine whether and when such a juror should be allowed to resume deliberations. Danger inheres, however, in allowing the deliberations to continue within only hours of the death. Courts have long recognized the extrinsic and extreme stress such an event interjects into the deliberations. (*Ante*, at pp. 1018-1022.) When the decision facing the jury is literally a matter of life and death for the defendant, prudence requires that, when the court is notified of the juror's tragedy, the court make a reasonably detailed inquiry *on the record* to determine the juror's ability to continue deliberations. Here the trial court's action (or rather lack of it) was less an exercise of discretion than it was an abandonment of that discretion. (Cf. *People* v. *Marks* (1988) 45 Cal.3d 1335, 1341 [248 Cal.Rptr. 874, 756 P.2d 260] ["We find illogical the notion that an agreement not to hear a matter constitutes a hearing of the matter."].) I believe the trial court erred in not conducting a meaningful inquiry on the record, preferably after counsel arrived in court, into Juror Coley's ability to resume deliberations under the circumstances.

The situation was exacerbated when counsel (defense and prosecution) arrived in court. Defense counsel promptly and in reasonable detail stated his concerns, which, as I have explained, were valid. At that point, the court should have attempted, although belatedly, to conduct the proper inquiry into Juror Coley's circumstances and to determine whether he should have been allowed to continue deliberations that day. The court also should have inquired whether Juror Coley had told the other jurors of his circumstance and the fact that deliberations would have to resume a week later if a verdict were not returned before he left early that day. Instead, the court rejected all of counsel's objections, except to state it would explain that counsel's earlier absence was not improper. In short, the court repeated its earlier error of not conducting an adequate inquiry and not making any informed determination whether deliberations should continue that day.

Nevertheless, I concur in the majority's judgment affirming the death sentence because the trial court's error, i.e., the failure to inquire adequately into Juror Coley's willingness and ability to serve, deprives us, as it did the trial court, of any basis on which to make an informed decision, based on the record, regarding whether Juror Coley should have been allowed to proceed. We simply do not know the specific facts of Juror Coley's mental state, whether by his own account or by those who observed him, or any facts regarding whether he communicated his circumstances to the other jurors, or whether the jury rushed its verdict. We therefore cannot properly decide on appeal that the error was prejudicial. That question can be decided on an

informed basis only if and when it is raised in a petition for a writ of habeas corpus.

Appellant's petition for a rehearing was denied June 21, 1995. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.